```
1              UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF NORTH CAROLINA
2                    (Asheville Division)

3

4  ---------------------------x
   UNITED STATES OF AMERICA,  :
5           Plaintiff        :
                             :
6                            :
   vs                       :Criminal Action:1:12-CR-25
7                            :
   DEBORAH LEE TIPTON,       :
8           Defendant.      :
   ---------------------------x
9

10                      Wednesday, September 18, 2013
                        Asheville, North Carolina

11

12      The above-entitled action came on for a Sentencing
   Hearing Proceeding before the HONORABLE MARTIN K.
13 REIDINGER, United States District Judge, in Courtroom 1
   commencing at 10:15 a.m.
14


15
        APPEARANCES:
16      On behalf of the Government:
        CORTNEY S. RANDALL, Esquire
17      U.S. Attorney's Office
        227 W. Trade Street
18      1700 Carillon
        Charlotte, North Carolina  28202
19

20      On behalf of the Defendant:
        JACK W. STEWART, Jr,., Esquire
21      P.O. Box 1920
        Asheville, North Carolina  28802
22


23


24
   Tracy Rae Dunlap, RMR, CRR            828.771.7217
25 Official Court Reporter
```

**I N D E X**

**DIRECT    CROSS**

S/A John Wydra..........29......37


**EXHIBITS**

                                                          **Page**

Government's Ex. 1................................35
Government's Ex. 1A...............................35
Government's Ex. 1B...............................35
Government's Ex. 2................................36

                                                    Page
Reporter's Certificate ........................98

# P R O C E E D I N G S

THE COURT:  The next matter we have is the case of United States versus Deborah Lee Tipton, which is before the Court for the sentencing of the defendant pursuant to her plea of guilty on the charges of knowingly transporting a visual depiction of the sexual exploitation of minors and photos of the sexual exploitation of minors, in violation of 18 U.S.C., Section 2252(a)(1), (a)(4)(B), and subsection (b).

Mr. Stewart, is the defendant prepared to proceed?

MR. STEWART:  Good morning, Your Honor.  Yes, sir, she's here and we're prepared to proceed.

THE COURT:  Ms. Randall, is the government prepared to proceed?

MS. RANDALL:  Yes, Your Honor.

THE COURT:  In preparation for this hearing, I will say I think I have read more things than I have read for any sentencing hearing in the last three years.  I have read a multitude of objections to the presentence report.  I have read the motion for departure on behalf of the defendant.  I have read the sentencing memorandum on behalf of the defendant.  I have read the letters of support submitted on behalf of the defendant.  I have read the government's statement or memorandum regarding

1 the issue of restitution. Are there any other items that

2 I should have reviewed that I didn't mention?

3        Mr. Stewart, any submitted by the defendant?

4        MR. STEWART: Your Honor, please. And I'm sure

5 you read them, because you had mentioned it in a

6 roundabout fashion. In addition to the motion filed by

7 the defendant for a downward departure, there was a

8 separate motion filed for a variance in this matter.

9 Your Honor's comment on that, so I note you have read

10 that.

11        THE COURT: I have.

12        MR. STEWART: Additionally, Your Honor, please,

13 there were a number of letters that were sort of combined

14 into one exhibit that was filed with the court. I think

15 it was filed at the same time for a motion for variance.

16 I'm sure that did not escape your attention either.

17        THE COURT: That's been reviewed as well.

18        MR. STEWART: Yes, sir. I had commented before

19 about the issue about all the exhibits that were

20 attached, both to Mr. Jackson's motion for downward

21 departure and his objections to the presentence report.

22 All of those exhibits, as I understand it, have actually

23 been incorporated into the record and offered before the

24 Court as exhibits in the sentencing -- the sentencing

25 hearing that's to take place. I just wanted to make sure

those were part of the record.  I think the Court has
assured me you felt it was, so it needs no further
explanation.

          THE COURT:  I was just checking again.  All of the
ones on the hard copy that was delivered for my review
show the entry in the electronic filing system and,
therefore, I'm confident that everything that I have
reviewed and was brought for me to review has in fact
been filed in the record in this court.

          MR. STEWART:  Thank you, Your Honor.  That's all
we would have.  Thank you.

          THE COURT:  Thank you.

          Ms.  Randall, was there anything else filed on
behalf of the government that I did not mention?

          MS. RANDALL:  No, Your Honor.

          THE COURT:  Ms. Tipton, I need for you to stand
please.  Do you recall appearing before the magistrate
judge on or about the 19th of September of last year for
the purpose of entering a plea of guilty in this case?

          THE DEFENDANT:  Yes, Your Honor.

          THE COURT:  Do you remember being sworn in or
being placed under oath at that time?

          THE DEFENDANT:  Yes.

          THE COURT:  Do you remember answering the
questions of the magistrate judge?

1          THE DEFENDANT:  Yes.

2          THE COURT:  Is it correct that at that time you

3     signed a Plea Inquiry Form indicating that your answers

4     were true and correct at the time they were given?

5          THE DEFENDANT:  Yes.

6          THE COURT:  Were your answers, in fact, true and

7     correct when you answered the questions of the magistrate

8     judge?

9          THE DEFENDANT:  Yes.

10         THE COURT:  If I asked you all the same questions

11    here today, would your answers be the same?

12         THE DEFENDANT:  Yes.

13         THE COURT:  Mr. Stewart, were you in attendance

14    at the Rule 11 hearing for your client?

15         MR. STEWART:  Yes, sir, I was.

16         THE COURT:  Are you satisfied that your client

17    fully understood the questions that were asked of her by

18    the magistrate judge at that hearing?

19         MR. STEWART:  Yes, sir, Your Honor.

20         THE COURT:  Are you satisfied that she has fully

21    understood the questions that I've asked her here today?

22         MR. STEWART:  Yes, sir.

23         THE COURT:  Ms. Tipton, did you answer those

24    questions the way that you did and are you pleading

25    guilty because you did, in fact, commit the crimes with

1  which you are charged?

2          THE DEFENDANT:  Yes.

3          THE COURT:  Is your plea of guilty the result of

4  any threat or force or promise, other than promises that

5  may be in your plea agreement?

6          THE DEFENDANT:  No.

7          THE COURT:  Are you pleading guilty voluntarily?

8          THE DEFENDANT:  Yes.

9          THE COURT:  In this case you're pleading guilty

10  pursuant to a plea agreement.  In that plea agreement,

11  you have agreed, and the government has agreed, to

12  certain facts and certain factors for sentencing.  Under

13  the law I am not required to accept those factors or

14  those facts simply because both sides have agreed.  And

15  if I decline to accept any of those facts or factors in

16  my sentencing decision you will not have the right to

17  withdraw your plea.  Do you understand that?

18          THE DEFENDANT:  Yes.

19          THE COURT:  I see you nodding, but I need it on

20  the record.

21          THE DEFENDANT:  Yes, sir.

22          THE COURT:  Do you understand that?

23          THE DEFENDANT:  I do understand that.

24          THE COURT:  Is it still your plea to plead guilty

25  in this matter?

1        THE DEFENDANT:  Yes, sir.

2        THE COURT:  Based on the representations made to

3   the Court and the answers given by the defendant at the

4   Rule 11 hearing before the magistrate judge, the Court

5   concludes and finds and confirms that the defendant's

6   plea is knowingly and voluntarily made and that the

7   defendant understands the charge, potential penalties,

8   and the consequences of her plea.

9        Mr.  Stewart, does the defendant stipulate that

10  there is a factual basis to support her plea of guilty

11  entered in this case and, further, that the Court may

12  accept the evidence as set forth in the presentence

13  report as establishing such factual basis?

14       MR. STEWART:  I have reviewed that report with my

15  client.  If Your Honor please, we accede to the contents

16  in it and we would stipulate there's a factual basis.

17  Yes, sir.

18       THE COURT:  Ms.  Randall, does the government so

19  stipulate?

20       MS. RANDALL:  So stipulated, Your Honor.

21       THE COURT:  Based on the stipulation of the

22  parties and the evidence as set forth in the presentence

23  report, which report was previously reviewed by the

24  Court, and based upon the defendant's admission of guilt,

25  the Court finds, concludes and confirms that there is a

factual basis for the defendant's plea. Accordingly, the

Court confirms the magistrate judge's acceptance of the

defendant's guilty plea. This court accepts the

defendant's plea of guilty, finds the defendant is

guilty, and enters thereon a verdict and judgment of

guilty.

Ms. Tipton, there is a document that has been

prepared. I see that your attorney is showing you a copy

there at your table. On the upper left-hand side it has

a caption that reads, "United States of America versus

Deborah Lee Tipton." On the upper right-hand side it has

a title that reads, "Presentence Investigation Report."

Have you had an opportunity to review this document

before today?

THE DEFENDANT: Yes, I have.

THE COURT: Have you had an opportunity to review

it with your attorney?

THE DEFENDANT: Yes, I have.

THE COURT: Do you understand the contents of that

document?

THE DEFENDANT: Yes, sir.

THE COURT: Mr. Stewart, have you had an

opportunity to review the presentence report with

Ms. Tipton?

MR. STEWART: I have, Your Honor.

1       THE COURT:  Are you satisfied that Ms. Tipton

2  understands the contents of the presentence report?

3       MR. STEWART:  Yes, sir.

4       THE COURT:  Thank you.  Ms. Tipton, you may take

5  your seat.

6       With regard to the presentence report, as I

7  mentioned earlier, there were many objections to the

8  presentence report.  I have reviewed those objections.  I

9  have reviewed the documents that have been submitted in

10  support of those objections.  Mr. Stewart, are there any

11  of those that you wish to be heard on further?

12       MR. STEWART:  Your Honor, please, there are just a

13  couple I would like to speak to.  We filed, as Your

14  Honor's already noted, a number of objections with far

15  greater detail, sometimes more duplicity than we should

16  have, so I'm not going to waste the Court's time any

17  further.  But let me call a couple of items just to Your

18  Honor's attention that were actually in our objections,

19  specifically, the objections I filed on behalf of

20  Ms. Tipton as opposed to those filed by co-counsel, Mr.

21  Jackson.

22       In paragraph seven I brought to the Court's

23  attention on page eight, paragraph 25 of the presentence

24  report.  I wanted the Court to understand in very plain

25  terms that Debbie Tipton has never denied recording the

1   victim in this case on the videotape that has been shown

2   or previewed by the Court.  You've actually seen two

3   segments of the videotape.  I think the evidence is that

4   it was actually a single taping session.  It was

5   interrupted by an attempt by Ms.  Tipton to try to clean

6   the lens of the camera.  But that being said, I want the

7   Court to also understand that Ms. Tipton had reason to

8   believe shortly after that recording, and a previewing of

9   that same tape both by the victim and my client, that

10  that recording had been deleted.  That was her initial

11  belief at the time.  She has repeated that throughout the

12  multiple filings we've had with this court.  And as I

13  recall, I think that was also the understanding or the

14  belief of the victim at the time, too, that it had been

15  deleted.  Obviously, that was not the case.  I think the

16  facts in this case bear out that that was a

17  misunderstanding.  But I wanted to call that to the

18  Court's attention.

19      Item number ten in my objections, if Your Honor

20  please, and I'm speaking specifically to page 12,

21  paragraph 46 of the presentence report.  I guess in

22  common parlance I was really just quibbling with the age

23  factor.  Mr.  Jackson addressed this same issue in his

24  objections on objection five.  Now we use that arbitrary

25  number of 12 years old, as the guideline reports, as sort

1  of a line in the sand where a four level enhancement is

2  ordinarily added.  We're not arguing with the fact that

3  the victim was not quite 12 at the time, but she was

4  about as close to 12 -- I think she was -- I think she

5  was 11 years, and maybe a month away from being 12 at the

6  time it happened.

7         Obviously, the investigation of this case, the

8  prosecution of this case, the guilty plea that was

9  entered by my client.  All of those events up to this

10 very day have presented the victim to the court at the

11 age of 12 or over the age of 12.  But at the time the

12 recording was undertaken, while I do not argue or

13 controvert the fact that she was just shy of 12 years,

14 old she was not yet 12.

15        The last item I want to call --

16        THE COURT:  Let me ask you, though, Mr.  Stewart.

17 In terms of your objection to the presentence report,

18 what difference does that make?  At this point, this

19 portion of the presentence report is for the technical

20 determination of what is the offense level, what is the

21 criminal history category, and whether it makes sense or

22 doesn't make sense.  2(g)(2.1)(B)(i)(a) says if the

23 victim is under the age of 12 then the four level

24 enhancement applies.  So, what are you objecting to?

25        MR. STEWART:  If Your Honor please.  I wanted the

Court to know, I guess, how close we were to that line.
I'm not arguing, in good faith, that the Court should not
apply it.  That's a pretty significant enhancement to any
sentencing, to add four points to it.  Your Honor's aware
of that.  There's a reason for that, and I understand
what the reason is by the Sentencing Commission.  I just
wanted the Court to be aware of the fact that the victim,
at the time this offense happened, and while we recognize
she was not yet 12, she was about as close to 12 as you
can get.  I understand that.

If Your Honor please.  And as far as that's
concerned, you'll get the opportunity to argue for what
the appropriate sentence is.  Right now we're on the
issue of the objections to the presentence report, so I'd
like for you to confine your arguments to the objections
to the presentence report.  Quibbling with what the
sentencing guidelines say or don't say, you can put that
in a letter to the Sentencing Commission.  Right now
let's keep the argument limited to your objections to the
presentence report, please.

MR. STEWART:  If Your Honor please.  The last
point I want to argue or call to the Court's attention is
where paragraph 11 deals -- paragraph 12, the page where
we contested the two points enhancement about the offense
involving the distribution of child pornography.  I want

the Court to understand what we were contesting there
really had to do with the explanation or the labeling of
what my client did, without whether that actually
constituted child pornography or not.  There was no
question that what she did was videotape a minor, or a
young person who was involved in some sort of sexually
explicit conduct, I think, is the actual term of art
that's used, both in the statute and in the guilty plea
that we entered into.

        The term "child pornography," as Your Honor knows,
has a separate and a different meaning by the definitions
in Section 2258.  And while I do not understand all of
the differences of those distinctions, there is a
distinction between child pornography and what my client
has admitted doing, entering a guilty plea before, and
stands before this Court for sentencing.

        I wanted Your Honor to know, and I wanted to make
it abundantly clear, that she does not deny the recording
or the possession or the transmission/distribution,
however you choose to characterize that of the videotape
she made.  She doesn't deny that at all and never has.
The issue was whether or not that videotape constituted
child pornography.  There's no question in my mind that
it constitutes a visual depiction of minors engaged in
sexually explicit conduct which is exactly what she was

charged with in and has entered a guilty plea to. And no matter how minor that distinction may be, it is a distinction recognized in the statute and I was simply trying to call that to the Court's attention.

THE COURT: Okay.

MR. STEWART: If Your Honor please, that would be the only objections. I think a number of other objections were filed, as Your Honor's noted, and many of those have been corrected or amended in the revised presentence report prepared and submitted by Mr. Woo. The other objections, many of which are academic -- and that may be a stretch of that word, but they are academic in nature. I don't think the Court needs to hear any further argument from the defendant.

THE COURT: Okay. Thank you, Mr. Stewart.

With regard to those objections. First of all, with regard to the objection in paragraph 47. There the two point enhancement is for whether or not the offense involved distribution. Yes, paragraph 47 refers to distribution of child pornography as a shorthand term rather than distribution of a visual depiction of a minor engaged in sexually explicit conduct, but the question regarding the enhancement is whether or not it is a distribution offense. As articulated by counsel, the defendant admits that it is a distribution offense and,

1 therefore, the objection is overruled. The two level

2 enhancement applies.

3       Likewise, with regard to paragraph 46. That is a

4 four level enhancement that applies if the victim has not

5 yet attained the age of 12 years. It is admitted by the

6 defendant in this matter that the victim in this case had

7 not yet attained the age of 12 years and, therefore, the

8 four level enhancement does apply. The objection to

9 paragraph 46 is overruled.

10       With regard to the other objections -- and there

11 were voluminous objections in this matter. As

12 Mr. Stewart says, they are of an academic nature. I've

13 gone through all of them, and all of those objections to

14 the presentence report are overruled.

15       Ms. Randall, I believe that you have filed

16 something just recently with regard to the three level

17 reduction for acceptance of responsibility in paragraphs

18 54 and 55. Do you wish to be heard further regarding

19 that issue?

20       MS. RANDALL: Your Honor, just to add to what I

21 wrote in the sentencing memorandum. The defendant --

22 there were multiple examples of the defendant denying

23 each and every element of the case from her knowledge to

24 -- and intent to what the video actually depicted. Even

25 after she entered her guilty plea, Your Honor, she was

1  going through her evaluations and she was still saying I

2  did not send this video; this video was not sexual.  The

3  whole purpose of someone receiving those points is where

4  someone clearly accepts responsibility.  All of her

5  conduct, Your Honor, and throughout her filings, she

6  continuously denies it.

7        Even today, Your Honor, she's standing up and

8  saying I thought I deleted those videos.  How could she

9  knowingly possess a video, Your Honor, and how can she

10 accept responsibility for knowingly possessing and

11 sending a video when she's still saying I thought I

12 deleted those videos?  She's denied every single element

13 except for the fact that she took the video and that it

14 involves interstate commerce.  This is clearly an example

15 where the defendant should not receive acceptance of

16 responsibility.

17       I won't go through all of the bullet points that I

18 have in my sentencing memorandum, Your Honor, but there

19 were numerous examples of her denying responsibility for

20 her conduct.  We would join with Probation's assessment

21 that she has not accepted responsibility for her offense.

22       THE COURT:  Thank you.

23       Mr.  Stewart, do you want to respond to that?

24       MR. STEWART:  Your Honor, please.  Section 3E1.1

25 of the guidelines provides that -- it tries to give the

1  Court, I think, some direction in determining whether any

2  defendant -- not just Deborah Tipton, but any defendant

3  appears before the Court and has accepted responsibility.

4  There's some criteria set out there.  Some of the

5  criteria are, first, that the defendant truthfully admits

6  her conduct.  The defendant sort of owns up, so to speak,

7  to what they did that was criminally wrong.

8       The Court can consider whether that individual

9  defendant has withdrawn where from that conduct is no

10  longer participatory or involved, whether that individual

11  has given assistance to the authorities of their own

12  conduct or conduct of others, and whether that assistance

13  is timely.  Those are just a few of the considerations

14  that I think applicable with the facts before this court.

15       Deborah Tipton, if Your Honor please, has shown

16  contrition from what she's done.  She's not avoided this.

17  I think there has been a great question in her mind,

18  certainly at the time she was arrested and taken into

19  custody, about how that video even existed.  She told the

20  investigators from the first time she was interviewed

21  that she thought that had been deleted from her computer.

22  You know from some of the filings in this case that she

23  was embroiled and involved in a heavily contested

24  domestic case.  Her ex-husband had access to her personal

25  computer and had hacked into that computer and literally

taken that computer to a third party source to review it
and examine the contents and duplicate it.

She didn't know if this was something that was retrieved
from a deleted file.  Even to this day we have not been
able to positively reconstruct it through the use of our
own forensic expert how.

     THE COURT:  Let me ask you this, Mr.  Stewart.

     MR. STEWART:  Yes, sir.

     THE COURT:  How is the statement that the
defendant believed that the video files had been deleted,
how is that consistent with the defendant admitting that
she in fact had transmitted those video files to
Mr.  Hamby?

     MR. STEWART:  If Your Honor please.

     THE COURT:  Is that not factually inconsistent?
If she says I thought I deleted it right after this was
created, but in reality she says I admit that I
transmitted it later to Mr.  Hamby.  It seems like those
two cannot exist in the same universe.

     MR. STEWART:  Let me argue to Your Honor why I
think that's not inconsistent.  She did in fact send
other videos to Mr.  Hamby, videos not of the nature of
the one Your Honor's had a chance to review.  She
remembers transmitting those and remembers making those
and sending those, just as she remembers recording the

1    ones that are the subject of this prosecution that she

2    and, evidently, the victim in this case also thought were

3    deleted.  She does not deny making it nor transmitting

4    it.  She is just not certain how it was transmitted.  She

5    has reason to believe, as we do representing Ms.  Tipton,

6    that that was sent at a time and a place when she sent

7    other videos of herself to Mr.  Hamby in this case.

8    That's the uncertainty of it, Your Honor.  It's not that

9    we deny sending it and not that we deny making it.  We

10   thought that one had been deleted.  But we sent other

11   videos along with this one, and we can only assume that's

12   how it was transmitted and that's how it was sent and

13   that's what she did.  She's owned up to that.

14          Now, what we've not attempted to do is to say,

15   well, we know it was deleted and we know it was

16   transmitted by some other source or some other person, so

17   we're not responsible for that.  We've not said that.  We

18   don't believe that.  But this is something -- this is a

19   notion, if Your Honor please, that we have evolved to

20   since we were first investigated about these charges and

21   first initially charged.  This is something we could not

22   answer directly at the time of the arrest.  This is

23   something we had to have our own forensic expert

24   reconstructing before we could make some sense of how it

25   was transmitted originally, Your Honor please.

1        I'm not trying to beg the Court's attention in on

2   this.  I want you to know there were other documents that

3   were sent or other transmissions that were made to this

4   same individual at or about the same time as this one.

5   And what we -- what we surmise is that we sent this along

6   with some of those.  So they're during the same period of

7   time to the same recipient.  But at the time it was made

8   and the time it was initially shown, it was previewed by

9   the defendant and the victim.  We thought it -- we

10  genuinely thought it had been deleted at the time, and I

11  think the victim thought the same thing at that time.

12       If Your Honor please.  We obviously know that is

13  not accurate and that is not what happened, because that

14  was -- if that was what happened, we wouldn't be here

15  today.  Does that affect the fact that she's been charged

16  with this offense and entered a guilty plea to this

17  offense and owned up to it?  I don't think so.  I don't

18  think that affects the fact that she has shown contrition

19  for her actions that she comes before this court

20  accepting responsibility for what she's done and standing

21  before the Court to be sentenced today.  That was her

22  genuine belief at the time it was done.

23       THE COURT:  Okay.  Anything further?

24       MR. STEWART:  No, sir.

25       THE COURT:  Thank you.  Ms.  Randall.

1       MS. RANDALL:  Your Honor, I would just say in

2   response to that that if she accidentally sent the video,

3   then she's not guilty of this crime.  The elements, as

4   explained to her by Judge Howell, was that she had to

5   knowingly, willfully and lawfully send a video depicting

6   a child engaged in sexually explicit conduct.  For her to

7   be guilty of that, she has to know she sent it.  If she

8   did it by accident while sending other videos, if that's

9   what her position is, she is not owning up to the

10  elements, Your Honor.  And this is not simply only that

11  element; it's every element, Your Honor.

12      Even after she pled guilty, she's still submitting

13  documents to this court and to her psychiatrist during

14  her evaluation saying maybe my husband did it to frame

15  me.  Maybe I accidentally did it.  I don't remember doing

16  it.  She's still saying it's not child pornography.

17  They're arguing to Your Honor that there was no lewd,

18  lascivious or sexual actions.  They're asking the Court

19  to view the images and that there's a complete absence of

20  anything of a sexual nature and that Ms. Tipton deemed

21  the videos strictly educational is debatable as to

22  whether the videos in question even meet the definition

23  of pornography.

24      Your Honor, these are pure anatomy showing the

25  labia and vagina with no averse sexual action depicted.

1  Those are the documents they're using to argue for her

2  variance, Your Honor, and these are all not showing

3  acceptance of responsibility and not showing contrition.

4  She's still saying I didn't do it.  I did this for an

5  educational reason and I accidentally sent it.  If both

6  those things are true, Your Honor, then she should have

7  pled not guilty.

8       THE COURT:  Mr. Stewart, does the defendant admit

9  that she knowingly transmitted this video to Mr. Hamby?

10      MR. STEWART:  Yes, sir, and that has never been

11  denied.  The uncertainty of when she did it or how she

12  did it was a question that she raised at the time of her

13  arrest, but she does not deny either recording or the

14  transmission of this.  That is not an issue by the

15  defendant.

16      MS. RANDALL:  Does she admit it is a child

17  engaging in sexually explicit conduct?

18      MR. STEWART:  Yes, and --

19      MS. RANDALL:  And she knew it was that when she

20  transmitted it?

21      MR. STEWART:  Yes.  We admit the film depicts

22  minors engaged in sexually explicit conduct; that was not

23  denied.  Now, whether there was the equivalent or same

24  and in common parlance to child pornography there was a

25  question I raised in my objection to the presentence

1  report regarding --

2      MS. RANDALL:  Did she know she was sending a video

3  of a child engaged in sexually explicit conduct?

4      MR. STEWART:  She knew that she was sending the

5  video that was transmitted to Mr. Hamby of her daughter

6  that she took involved in that conduct.  Yes, sir.

7      MS. RANDALL:  Your Honor, that's not accepting the

8  elements of the crime.  That's parsing it, Your Honor.

9  She has to have known she sent a video depicting the

10 minor.  She has to know what video she sent to be guilty

11 of this crime.  She's still saying it was an accident.

12     MR. STEWART:  Judge, she's not saying that was an

13 accident.  And, you know, for the government to ascribe

14 the reason that she pled guilty -- there are lots of

15 reasons for someone to enter a guilty plea, even upon

16 their own acceptance and admission of guilt.  I don't

17 mind telling the Court very candidly that one of the

18 reasons we negotiated the guilty plea in this case was to

19 avoid any further trauma or any further exposure or

20 embarrassment for the child involved in this case.  That

21 was one of the reasons.

22     I mean, there were a lot of reasons to enter the

23 plea that was done here.  But the fact that we did that

24 with other reasons in mind or other motivations does not

25 mitigate the fact that we have accepted responsibility

1  for what we've done.  She has never been interviewed a

2  single time that I am aware of by anyone associated, at

3  least in law enforcement and the investigation or

4  prosecution of this case, where Debbie Tipton said

5  huh-uh, it wasn't me.  I didn't do it.  She hasn't tried

6  to step away from that.  She has tried, to the best of

7  her knowledge, if Your Honor please, to explain it and to

8  determine how it happened.

9      She has not shied away from the fact that, as she

10  appears before this court today, she has admitted her

11  guilt.  She is contrite.  She is apologetic.  She is

12  remorseful for what she's done.  I, frankly, cannot

13  imagine any person being more remorseful than the

14  defendant in this case, given the relationship that

15  existed before the time of the charging and where we have

16  evolved to now 17 months later.

17      THE COURT:  Okay.  With regard to this issue of

18  the question of responsibility.  I actually find this

19  issue to be somewhat difficult, because the first thing I

20  have to do is I have to draw the line between what the

21  defendant admits to and then some of the statements that

22  have been made on her behalf by others which I don't

23  necessarily attribute to the defendant.  As I mentioned

24  before, there was a multitude of filings by the attorneys

25  in this case.  Some of the filings on behalf of the

defendant certainly give rise to a serious question as to
whether there is an acceptance of responsibility or
whether the defendant remains in sheer and utter denial
of her own criminality. However, I can put those aside
as the statements of counsel as opposed to the statements
of the defendant.

I still find even the degree of parsing that I am
hearing today as very, very troubling because it does
show a certain level of remaining in a state of denial.
However, in light of the specific representations made
here, I believe that the defendant has admitted and
confessed to each and every one of the elements of the
crime involved and that the three level acceptance of
responsibility -- excuse me, the two level acceptance of
responsibility does apply here. That, of course, raises
the question of whether or not the government is making a
formal motion for the additional level under 3E1.1B.

Ms. Randall, what says the government as to that?

MS. RANDALL: If Your Honor has found she clearly
accepts responsibility, the third level is -- I believe
Your Honor does not address acceptance of responsibility
as to whether she entered her plea in a timely manner and
prevented us from prepping for trial. So I do not think
that we can object to the application of that, Your
Honor.

1    And if Your Honor wouldn't mind me just being

2  heard on one further thing.  Based on your ruling, I

3  would just note for the record that the government's

4  argument is based on Mrs.  Tipton's own words, what she

5  told the psychiatrist.  Even if you take out everything

6  that her attorneys have said, she told her psychiatrist

7  -- Mrs.  Tipton stated several times during the interview

8  that she'd never been aware she was sending the videos.

9  She expressed confusion she was sending the videos.  She

10 was unsure if she accidentally sent the videos.  These

11 are all her words.  Ms.  Tipton denies intentionally

12 sending the videos.  That's what she told the

13 psychiatrist, whose report they're asking you to rely on,

14 Your Honor.  So it's not just what her attorneys are

15 telling Your Honor in the argument; it's what she

16 actually said to people about her case.

17    THE COURT:  Well I've made my ruling as to that

18 matter and that will stand.

19    Are there any other issues regarding the

20 presentence report that need to be addressed?  Any

21 further for the defendant, Mr.  Stewart?

22    MR. STEWART:  Not from the defendant, if Your

23 Honor please.

24    THE COURT:  Any for the government, Ms.  Randall?

25    MS. RANDALL:  No, Your Honor.

1        THE COURT:  Therefore, the Court will accept the

2   presence report as written and therefore will find

3   that the total offense level in this case is 37, and the

4   criminal history category in this case is one.  Based on

5   that total offense level and criminal history category

6   the Court will conclude, as a matter of law, that the

7   guideline range for this case is 210 to 262 months of

8   incarceration.

9        Mr.  Stewart, did I calculate that correctly?

10        MR. STEWART:  Yes, sir, you did.

11        THE COURT:  Ms.  Randall, do you agree?

12        MS. RANDALL:  Yes, Your Honor.

13        THE COURT:  Based on the discussions that we had

14   in chambers concerning the procedure for going forward,

15   Ms.  Randall, I understand that the government wishes to

16   present some evidence with reference to sentencing before

17   we move on to any arguments.  Is that correct?

18        MS. RANDALL:  Yes, Your Honor.  We just want to

19   briefly present a witness in order to establish the basis

20   of our -- some of the other facts that we argued in our

21   sentencing memorandum that were not in the PSR.

22        THE COURT:  Call your first witness.

23        MS. RANDALL:  The government calls Agent John

24   Wydra.

25        THE COURT:  Come forward to be sworn.

1          (Witness duly sworn at 10:48 a.m.)

2        THE COURT:  You may proceed.

3               **DIRECT EXAMINATION**

4        BY MS. RANDALL:

5  Q.    Can you please state your name and where you work?

6  A.    John Wydra.  I'm a Special Agent with the FBI.

7  Q.    And what type of cases do you work at the FBI?

8  A.    Crimes against children.

9  Q.    And how long have you been working in that

10 capacity?

11 A.    The second time since 2010, and I had worked in

12 that capacity in 2004 through 2006.

13 Q.    And in your role as an FBI agent, were you

14 involved in the investigation of the defendant?

15 A.    I was.

16 Q.    And are you familiar with all the documents and

17 evidence in this case?

18 A.    I am.

19 Q.    And as part of your investigation, did you

20 interview Chad Bloom?

21 A.    Chad Hamby.

22 Q.    Sorry.  Chad Hamby.  Thank you.

23 A.    Yes.

24 Q.    And when did that interview take place?

25 A.    It was July 13th 2012.

1  Q.      And at that time, who was present for the

2  interview?

3  A.      It was myself, Chad Hamby, Detective Anderson, and

4  Chad's attorney.

5  Q.      And was Mr. Hamby -- did Mr. Hamby talk to you

6  about his role in the offense that we're here for today?

7  A.      He did.

8  Q.      And did he talk to you about his relationship with

9  the defendant?

10  A.      He did.

11  Q.      What did he tell you about who initiated the

12  extramarital affair?

13  A.      He said that it was Deborah Tipton.  That they had

14  this affair over a seven-year period, and that it

15  progressed over that period of time to more of a

16  fantasy-type of relationship.

17  Q.      And what do you mean by that?

18  A.      Well, how he described it is that it started to

19  move online.  In the beginning it was all face-to-face

20  type conversations, and then it started to be on Facebook

21  and Facebook chats.  Then it started to involve what he

22  described as darker and darker fantasies.

23  Q.      When you describe "darker and darker fantasies,"

24  what are you talking about?

25  A.      He said it was just normal.  It all started out as

1  just normal sex chat, and then it moved into bestiality

2  and children.

3  Q.     And did he say approximately when they started

4  having these fantasies about children?

5  A.     He said it was about three years prior to him

6  receiving the videos, and that they had discussed

7  multiple violent type sex acts with children over that

8  three-year period.

9  Q.     And when you say "they," you're referring to

10 Mr.  Hamby and who?

11 A.     Deborah Tipton.

12 Q.     Did he say who would come up with these fantasies?

13 A.     He said it was mostly Deborah Tipton and that she

14 did that to excite him and to sexually arouse him so that

15 later on that they could meet and have sex.

16 Q.     And according to Mr.  Hamby, did the victim in

17 this case ever become a part of those fantasies?

18 A.     Yes.

19 Q.     Who introduced the victim into their fantasy

20 chats?

21 A.     Deborah Tipton.

22 Q.     At some point, did the relationship between

23 Mr.  Hamby and Ms. Tipton start slowing down or fizzle

24 out?

25 A.     It was shortly -- according to Chad Hamby, it was

1  shortly after he had received the videos of Deborah's

2  daughter.

3  Q.      Did Mr.  Hamby -- in talking about what

4  Mrs. Tipton and he discussed, did she ever talk to him

5  about the victim in this case with regards to bathing or

6  showering?

7  A.      Yes.  She had described that you should see how

8  she's maturing.  She's getting older now.  And this was

9  in reference to Chad Hamby having told Deborah Tipton

10  that he had downloaded child pornography years earlier

11  through something called LimeWire and how excited that

12  had made him.  He felt that she was trying to feed that

13  fantasy.

14  Q.      And at some point, Ms.  Tipton sent Mr.  Hamby a

15  video?

16  A.      Yes.

17  Q.      In terms of receiving that video.  What did

18  Mr.  Hamby say about any notification or warning he may

19  have gotten from Mrs.  Tipton prior to receiving that

20  video?

21  A.      He had received a text message prior to that that

22  said I have a surprise for you.  Deborah Tipton had sent

23  that text message saying she had a surprise for him.  He

24  said he knew right away, when he received that text

25  message, what that video was going to be.

1  Q.      And back it up one step.  When she told him, you

2  should see how the victim is developing, you should see,

3  you know, how she's maturing, what did Mr.  Hamby say in

4  response to that?

5  A.      He knew that it was going to be child pornography

6  similar to what he had seen in the past on Limewire.

7  Q.      And did he request her to send them to him?

8  A.      He did.

9  Q.      Prior to her raising the information that she --

10  about the victim developing, had Mr.  Hamby asked for her

11  to send him videos of the victim in the shower?  Did that

12  make sense?  I can reword that.

13  A.      Yeah, if you could.

14  Q.      But for -- according to Mr.  Hamby, but for

15  Mrs. Tipton telling him about the victim in this case and

16  the videos she had of her in the shower, would Mr.  Hamby

17  have requested the videos, according to him?

18  A.      Well, there were numerous sexual fantasy

19  conversations over that three year period, and it

20  culminated into this video of the victim.  And then when

21  he had learned that that video existed, he asked for

22  Ms. Tipton to send it to him.

23  Q.      You said that she sent him a message that she had

24  a surprise waiting for him.  Did she say anything else to

25  him about viewing the video prior to him looking at the

1  video?

2  A.      Yeah.   He had said that she wanted to be there

3  when he watched it so that she could sit on his lap and

4  feel him get hard.

5  Q.      And when the video was sent to Mr. Hamby, was

6  there any sort of header or, you know, label on the

7  video?

8  A.      Yeah.   The subject said "Enjoy," the subject line.

9  Q.      And is that consistent with Ms. Tipton -- what

10  Mrs. Tipton had said she typed in when she sent the video

11  to Mr. Hamby previously?

12  A.      Yeah.   On February 21st 2012, Ms. Tipton, in her

13  interview, said that she believed she sent that video

14  with the title enjoy.

15  Q.      And what did Mr. Hamby say was the purpose of

16  Mrs. Tipton sending him the video?

17  A.      It was for his sexual gratification and to feed

18  their -- and continue to feed their fantasies about

19  children.

20  Q.      I'm going to show you what I previously marked as

21  Government's Exhibit 1.   Do you recognize that?

22  A.      Yes.

23  Q.      And is it a CD containing the videos that

24  Mrs. Tipton sent to Mr. Hamby?

25  A.      Yes.

1  Q.    Your Honor, the government would move to introduce

2  Exhibit 1 into evidence, just for the record.

3        THE COURT:  Okay.  Let it be admitted.

4              (Whereupon, Government's Exhibit No. 1

5              was admitted into evidence without

6              objection.)

7        BY MS. RANDALL:

8  Q.    Are you previously examined Government's Exhibit

9  1A and 1B which are transcripts?

10 A.    Yes.

11 Q.    Do those transcripts accurately reflect the

12 conversations that were on the videos in Government's

13 Exhibit 1?

14 A.    Yes.

15 Q.    Your Honor, the government would move Exhibits 1A

16 and 1B into evidence.

17       THE COURT:  Any objection to that, Mr. Stewart?

18       MR. STEWART:  No, sir, Your Honor.

19       THE COURT:  Okay.  Let it be admitted.

20              (Whereupon, Government's Exhibits No. 1A and

21              1B were admitted into evidence without

22              objection.)

23       BY MS. RANDALL:

24 Q.    I'm going to show you what I've marked as

25 Government's Exhibit 2.  Do you recognize Government's

1 Exhibit 2?

2 A.     I do.

3 Q.     Can you tell me what it is?

4 A.     Yeah.  This is the transcript of the Deborah

5 Tipton interview I referred to earlier dated February

6 21st 2012.

7 Q.     And does this transcript fairly and accurately

8 represent the audio recording that was made of that

9 interview of Ms.  Tipton?

10 A.     It does.

11 Q.     Your Honor, the government would move Exhibit 2

12 into evidence.

13         THE COURT:  Any objection, Mr.  Stewart?

14         MR. STEWART:  No objection, Your Honor.

15         THE COURT:  Let it be admitted.

16             (Whereupon, Government's Exhibit No. 2

17             was admitted into evidence without

18             objection.)

19         BY MS. RANDALL:

20 Q.     Going back to prior to the video being sent. at

21 some point ,did Mr.  Hamby move to another school?

22 A.     He did.  It was sometime in May 2011.  He had left

23 the school that he had worked at with Ms.  Tipton.

24 Q.     And how did that affect his relationship with

25 Ms.  Tipton?

A.      It almost brought it to a halt.  They didn't see

each other.  They got wrapped up in different things.

The relationship had slowed from May 2011 until it

started ramping back up in August 2011 through September,

when Ms. Tipton sent the videos.

Q.      No further questions, Your Honor.

        THE COURT:  Cross-examination.

                    **CROSS-EXAMINATION**

        BY MR. STEWART:

Q.      Agent Wydra, good morning.

A.      Yes, sir.

Q.      The information you shared with us that you

learned from interviewing Mr.  Hamby.  You have never

interviewed Ms.  Tipton, have you?

A.      No.

Q.      You've never taken a statement from her or

confronted her or asked about this information that's

shared with you by Chad Hamby.  Correct?

A.      That's correct.

Q.      We met one time in Charlotte in the investigation

of this case sometime ago and you showed us a bevy of

computers and -- excuse me, I lack of nomenclature to

describe what you do.  But among other things you do is a

forensic analysis, I believe, of hardwares and softwares,

programs and things of that nature.  Is that correct?

A.     The FBI does.  I don't do the computer forensics.
I'm the investigator.  We have a team that does that for
me.

Q.     You were certainly involved in the receipt and
interpretation of all the hardware and software in this
case.  I know you shared a lot of that information with
Ms.  Tipton's counsel over the last year, year and a
half.  Is that accurate?

A.     Yes.

Q.     In this case, besides the Government's Exhibit No.
1 that was marked and shown in chambers earlier today,
that one disk, you also had before you a computer, a hard
drive and things of that nature that were all ascribed to
my client, to Ms.  Tipton.  Those were also available to
the FBI, were they not, in this investigation?

A.     Available to the FBI?  Yes.

Q.     And a complete forensic work-up, a complete and
thorough forensic examination, was done of all of the
electronic devices that was presented to your office
either by her estranged husband, Joe Tipton, and devices
that came from the school that Deborah Tipton had access
to:  a FlipShare camera that may or may not have been
owned by the school but that Chad Hamby had at some
point.  Those are just a few of the many examples of
devices made available to you and your bureau for

1  forensic examination; is that correct?

2  A.      Yes, sir.

3  Q.      Is it accurate to say that in the complete

4  examination done of all of those devices over the last

5  year and a half that the FBI has not found any other

6  photographic evidence of any minors engaged in any sort

7  of elicit activity other than what has been depicted on

8  Government's Exhibit 1 here today?  Is that right?

9  A.      That's correct.

10  Q.      With respect to this information Chad Hamby shared

11  with you about the course of their relationship and that

12  over the last three years they began to engage in this

13  discussion involving fantasy talk that turned more

14  unusual.  Is it fair to say you found, in your review of

15  all the devices and all the information provided in

16  Ms.  Tipton's case, no evidence of any sort of talk

17  involving minors?

18  A.      Correct.  We did not.

19  Q.      Is it also fair to say that in your examination of

20  all those devices that you have never found any e-mails,

21  any text messages or anything that corroborates what Chad

22  Hamby has led you to believe was this discussion he

23  claims Deborah Tipton instigated or started with respect

24  to the progression of these fantasy discussions he would

25  have with her?  Is that correct?

1 A.     That's correct.

2 Q.     No evidence at all from any of the devices

3 examined by your bureau over the last year and a half.

4 Right?

5 A.     From the devices?  Correct.

6 Q.     Is that correct?  Now, Chad Hamby led you to

7 believe that the elicit relationship he had -- Mr.  Hamby

8 was also married at the time, was he not?

9 A.     I'm sorry.  Say that again.

10 Q.     Pardon?

11 A.     Mr.  Hamby -- I didn't hear the last word.

12 Q.     Mr.  Hamby was also married at the time, was he

13 not?

14 A.     Yes.

15 Q.     As was Ms. Tipton?

16 A.     Yes.

17 Q.     But he led you to believe that relationship the

18 two of them struck up some years ago was largely

19 Ms.  Tipton's doing and that it was all sort of on her.

20 Is that correct?

21 A.     If that's what I implied, that's not what I

22 intended.  I'm telling you that Mr.  Hamby felt that the

23 relationship started with Mrs. Tipton.  And he clearly

24 states throughout the entire interview that he's to blame

25 and that he shares this blame and where this has led to

and that he was being very selfish; that it was about his

sexual gratification.  He just did not feel that he was

in love with Mrs.  Tipton, that it was purely a sex-based

thing, and he believed that she felt the same way.

Q.     Well, at least from his point of view, he led you

to believe this was purely a sexual relationship.  Right?

A.     Correct.

Q.     And he engaged in this relationship with my client

purely for his own sexual gratification, at least from

his point of view.  Is that what he led you to believe?

A.     Yes, sir.

Q.     He revealed to you, did he not, that at some point

during the course of that relationship he had instructed

Ms.  Tipton to install this Limewire program on her

computer?  I think it was a computer at the school; is

that right?

A.     I don't believe it was the computer at school.  I

believe it was a computer that he had owned at his

residence that had long since crashed and he could no

longer have in his possession.

Q.     That was a computer he had provided her with,

though, right?

A.     That I don't know.  I'm not aware of that.

Q.     I'm sorry?

A.     Yeah.  I'm unaware of that if that's what

1  happened.

2  Q.     Do you know if he was the one that instructed her

3  how to put this Limewire program on that computer?  Do

4  you know that?

5  A.     He had said during the interview that he had

6  stopped using Limewire because he had heard that it was

7  illegal and that he had stopped using it four or five

8  years prior.  So, instructing Ms. Tipton?  I don't

9  recall him saying that.

10  Q.     You are concerned, as an investigator in this area

11  of investigations, about Limewire being used, are you

12  not?  Because you know how that's utilized in the porn

13  industry, is it not?

14  A.     It used to be.  When I first worked crimes against

15  children, Limewire was very prevalent.  Now it's not.

16  Q.     So you're not saying he didn't provide her with

17  the computer or didn't instruct her or really direct her

18  to install this program so she could access various

19  things.  You're saying he just didn't reveal that to you.

20  He didn't tell you that.

21  A.     He didn't tell me that.  No, sir.

22  Q.     All right.  Did he tell you about the fantasies

23  that he introduced into this relationship not just

24  involving minors but fantasies involving bondage and

25  voyeurism?

A.      Yes.

Q.      Did he tell you about the fantasies that he injected into this relationship that involved even rape scenarios?  Did he tell you about that?

A.      He said that the rape scenarios were introduced by Ms.  Tipton.

Q.      He said that came from her and not from him?

A.      Correct.

Q.      Did he tell you about the notions that he injected into this relationship involving looking at and viewing young females?

A.      Yes, he did say that.

Q.      He actually admitted that he'd been doing that on the Internet, I think, for about three to five years.  Is that right?

A.      He said he did it three to five years ago and that he had told Ms. Tipton about that and that that's what changed their sex fantasies from more of the bondage and bestiality over to include children and more of the violent rape fantasies.

Q.      And he told you that he was previewing on the Internet through whatever program was available these young females between the ages of, what, 13 and 15 years old, and that that had been ongoing even before he met Ms.  Tipton?

A.      Actually, he admitted that it was as young as 12
during that interview.  And he had said that he had done
that with Limewire prior to -- like I said, up to five
years prior to the videos being sent.  But their
discussion of that time frame in his life was revolving
around when the videos were sent.

Q.      Now, with respect to what you found and were able
to determine from your investigation of Ms.  Tipton.
There was no Limewire recordings that were found, there
were no videos of minors in any fashion, and there
certainly was no discussion at any point between
Mr.  Hamby and Ms.  Tipton about his interest or his
predilection in young minors.  There was nothing found.

A.      Correct.  There was no evidence of that found on
the devices.

Q.      Was it Chad Hamby who told you that the purpose
for being involved in the relationship with Deborah
Tipton and, really, the interest he had in young persons,
particularly the victim in this case, was for his own
sexual gratification?  Is that what he told you?

A.      Yes.

Q.      Did you find any sort of evidence, any sort of
indicators, aside from what Chad Hamby led you to
believe, that Deborah Tipton had some sort of sexual
gratification in that same area?

1  A.     He described her sexual gratification on getting

2  him excited.  Like, it fed on each other.  Her sexual

3  gratification came from getting him sexually aroused,

4  whatever that would do for him.

5  Q.     And that's what he told you?

6  A.     Yes.

7  Q.     Now, he told you that at or about the same time of

8  the subject video that we're dealing with here,

9  Government's Exhibit No. 1, that he had asked -- really,

10  he had implored Ms. Tipton to make some videos of

11  herself.  Would that be a fair statement?

12  A.     He said that she often sent videos of herself

13  masturbating and that he had done it on at least one or

14  two occasions himself.

15  Q.     Yes, sir.  Did he tell you that he had asked -- he

16  had made that specific request of her?

17  A.     He didn't deny it.  He said that it was a back and

18  forth type of thing.  It was a very exciting for them to

19  discuss any type of sexual activity and that that's what

20  he fed off of.

21  Q.     And did he tell you that he had actually received

22  videos, more than one, of Ms. Tipton during the same time

23  frame -- at or about the same time frame as this

24  showering video, Government's Exhibit No. 1, that we're

25  describing occurred?  Did he tell you that?

A.      Yeah.  It was during the same 30- to 60-day time
frame.  He said she'd often send it throughout that
period of time, but on FlipShare is where we found most
of the evidence.

Q.      And FlipShare is the camera or the recording
device that was used, I take it, to record what's shown
on Government's Exhibit 1?

A.      No.  The flip camera is the device that was used
to record it.  FlipShare was the website where Ms. Tipton
had uploaded it from her residence and shared it with
Chad Hamby using their e-mail addresses.  I don't want to
give you the impression of, like, she e-mailed it to him.
She loaded it on FlipShare and had sent an e-mail
notifying him that that video existed.

Q.      And I'm sorry if I was confused over the flip
camera and the FlipShare.

A.      Me, too.

Q.      The flip camera was actually the device that was
used to record not only what's shown on Government's
Exhibit 1 but, I think, some of the other transmissions
that were made by Ms. Tipton?

A.      Yes, sir.

Q.      And that was a camera that was actually provided
by Mr.  Hamby, as I understand it?

A.      Yes, I believe so.

1  Q.      And Mr.  Hamby -- did he ever reveal to you that

2  he had instructed Ms.  Tipton, sort of, how to use this

3  and in what manner or form it might be used?  Did he ever

4  share that to you or volunteer that to you in any manner?

5  A.      He didn't say that during that interview.  I was

6  under that impression from all the evidence in the case

7  and his previous interview and other conversations he had

8  with law enforcement.

9  Q.      But Chad Hamby, when he told you that at some

10 point Ms.  Tipton had told him she wanted to be present

11 when he watched it, when he watched the video, he led you

12 to believe that was a discussion she was having with him

13 about when he watched the showering video, Government's

14 Exhibit No.  1.   Right?

15 A.      Yes.

16 Q.      He did not say that was as best he could recall.

17 What he asked -- or she asked him to do when he was

18 watching the videos of herself, the multiple videos

19 Ms.  Tipton had sent to Mr.  Hamby of herself pleasuring

20 herself.

21 A.      Correct.  He said it was for the showering videos

22 of the victim.

23 Q.      Thank you.  That's my questions.

24         THE COURT:  Any redirect?

25         MS. RANDALL:  No, Your Honor.

1        THE COURT:  Thank you, Agent Wydra.  You may step

2  down.

3                    (Witness excused at 11:08 a.m.)

4        THE COURT:  Ms.  Randall, will there be any other

5  evidence?

6        MS. RANDALL:  No further testimony.  Only, for the

7  record, we would introduce Government's Exhibit 3 for

8  purposes of our argument.  This is a copy of Mr.  Hamby's

9  deposition in Tipton versus Tipton, the civil matter.  At

10  the appropriate time we've marked as Exhibit 4, which is

11  a Victim Impact Statement, prepared by the victim's

12  father.

13        THE COURT:  Mr.  Stewart, will there be any

14  evidence for the defendant with regard to sentencing?

15        MR. STEWART:  We would not have any documents, if

16  Your Honor please, nor any live testimony we would offer

17  at the sentencing.  You have the various memorandums of

18  law; most of them have been filed as attachments and

19  they've already been marked.  We have no other offering

20  besides that if, Your Honor please.

21        THE COURT:  With that, then, Mr.  Stewart, let me

22  hear from you.  What is the appropriate sentence for me

23  to impose in this case?

24        MR. STEWART:  If Your Honor please.  I'm going to

25  do what I can to streamline this argument, but I want to

talk about two motions that are before the Court before I
actually close.  I won't be brief on those.  There was a
motion filed by my co-counsel, Mr.  Jackson, who's
unavailable today because of an unexpected loss.  He
filed -- and his motion for downward departure maybe not
in as artful language as he should have.  But because
Mr.  Jackson doesn't practice over here, certainly, in
criminal courts very frequently -- in fact, this may be
the first time he's appeared in criminal court, I don't
know.

        Before Your Honor there are really two substantive
grounds in his motion for downward departure.  First, he
asks the Court to consider a 5K1.1 reduction in this case
because of Ms.  Tipton's assistance to the authorities.
Ms.  Tipton, from the time that she was first
interviewed, has provided assistance to the authorities,
including not only making a statement outlining her own
involvement and her own culpability but also highlighting
the culpability of Mr.  Hamby.

        Mr.  Hamby subsequently came under the guise of
the investigation and subsequently came to be charged and
investigated in this case in no small part because of the
revelations made early on by Deborah Tipton.  Her
information about that relationship, her information
about how Government's Exhibit 1 came to be, those were

all bits of information gleaned from her debriefings and in her interviews. And I would say to the Court that those interviews were reliable, they were complete, and they were truthful.

Unlike Mr. Hamby, who's already appeared before you today, the government has not filed a 5K1.1 in Deborah Tipton's case. She is seen by the government, I presume, as the principal wrongdoer here. But I would say to Your Honor that had she not provided the assistance that ultimately led to the arrest of Hamby in this case, there likely would not have been a co-defendant in this case before the Court, and that is one of the grounds the Court may consider in awarding an adjustment for substantial assistance to the authorities.

There's a second grounds for the Court to consider making a downward departure and that's 5K2.2, the abhorrent behavior exception. Thankfully, this exception was recognized by Mr. Woo in the revised presentence report. I don't see this exception used much; I guess that's because so few defendants actually fall within the pretty stringent guidelines. As I read 5K2.2, for abhorrent behavior to be considered by the court for a downward departure, it must be a single act or occurrence. It must be without any sort of significant planning. It must be of limited duration, the act

itself, and it must be a deviation from that person's
otherwise law-abiding life.

I think Deborah Tipton and the circumstances and
facts of this case fall within that very narrow, very
limited application.  The clip that we have before you in
Government's Exhibit No. 1 was a single act, a single
occurrence.  We know that because the FBI, over the last
17 months, has done, frankly, an exhaustive forensic
search of anything electronic that Ms.  Tipton and,
perhaps, Mr.  Hamby had access to.  This is the only
rendering, the only finding of anything, anything
inculpatory of this nature that was found.  I can -- Your
Honor knows from the arguments made by the defendant in
this case that, while we have two clips, one about six
minutes, one about two minutes, what has been put before
the Court is -- that was actually a single setting, a
single session that was interrupted with Ms.  Tipton
wiping the camera lens.  We would say that that taping
was without any sort of significant planning.

The government has argued, well, that's just
another expression of Deborah Tipton's deviousness and
her trickery and her deception in this case.  We would
say that's not at all what occurred.  And I would say the
best evidence of what that is, what appeared on the tape
itself -- and I'm not talking about just the actions of

the defendant, I'm talking about the actions of the
victim.  For abhorrent behavior to be applicable it must
be of limited duration.  That certainly was the case of
what was found and the period of the recording, and it
must be a deviation from a person's law-abiding life.  I
want to think that's probably the one qualification,
Judge, that makes most defendants not applicable or not
able to be considered for this grounds for departure.

I'm not here to tell you my client was a saint.
She engaged in an extramarital relationship with Hamby
that started in the workplace.  She's likely not the
first woman to do this or probably won't be the last.
But aside from that, she has led a law-abiding life with
the exception of this single act, the single occurrence
of abhorrent behavior, and I think that it would entitle
her or at least make her eligible for consideration by
this court for a departure.

THE COURT:  Let me stop you there for a moment,
Mr. Stewart.

MR. STEWART:  Yes, sir.

THE COURT:  With regard to 5K2.2.  You do set out
the elements under subsection (b), but you'll notice also
under subsection (a) it says, "except where a defendant
is convicted of an offense involving a minor victim."  Is
this not within the exception to the exception?

1      MR. STEWART:  If Your Honor please.  You know,

2  actually, I had read that some time ago when I was

3  preparing my objections.  I did not remember reading that

4  when I was preparing for this hearing today.  If that's

5  what it reads in the language, it speaks for itself.  It

6  means what it says.  Your Honor, please, we are not

7  arguing that the victim in this case was not a minor at

8  the time.

9      Your Honor, please, the second motion before this

10  court is a motion for variance and I can take the blame

11  for that one.  I was the one who prepared and filed that.

12  That motion for variance really just addresses the

13  Section 3553 factors.  I set out with some degree of

14  brevity, I think, the 11 factors I think this court can

15  consider.  Mr. Woo recognized some of those factors in

16  the revised copy of the presentence report he filed with

17  this court.  The Court can consider any combination or

18  number of factors, or none of the factors, in fashioning

19  a sentence that you think is just and meet it is criteria

20  of 3553.  I would just say to the Court that the evidence

21  before this court is that Deborah Tipton was a loving and

22  attentive mother.  She was a primary caregiver of

23  children in the home.  We can't forget, I think, that

24  what happened and what we are here today -- this criminal

25  prosecution, really, arose out of a hotly contested

domestic case, a lawsuit, a fight, between her and her
estranged husband over custody and support and issues
like that. And while that is certainly no explanation or
justification for what's happened, that's how this drama
was played out at the time.

My client appears before the Court with no prior
record of any kind. The harm that was actually
experienced by the victim in this case is really hard to
determine, really hard to assign at this time. It is
certainly serious. Your Honor has pointed out in other
hearings, and oftentimes harm in these kind of cases
really doesn't rise to the level or present itself until
years down the road. And it's hard to speculate or guess
when and if that will happen in this case. But I would
say that at least one thing that has been repeated by
various therapists involved in the case is that whatever
harm has occurred to the victim has certainly been no
less than, and the equivalent of the harm that the victim
has continued to experience, having whatever trusting
relationship she had with the defendant in this case
severed, cut off, removed from the home.

There is a gross disparity in this case too,
Judge, I think, between the roles -- certainly, the
sentences that the government argues Mr. Hamby should
have received and received and what Deborah Tipton is

facing in this case.  There is no history of deviant

behaviors.  There's no history of her being a pedophile.

As Your Honor knows, there is already a significant

punishment in this case, as there was in Hamby.  And my

client, as well, has lost her teaching credentials and

license.  She's been incarcerated for the last 17 months.

When she eventually serves whatever sentence she serves,

she will come out as a convicted felon and a sex

offender, and we know what kind of restrictions those

labels carry.

You know from the various reports and

examinations, the evaluations and diagnoses in this case

that Ms.  Tipton, unlike most sex offenders who appear

before this court, is at a very, very low risk to

re-offend based on the nature and the circumstances

surrounding this charge.  You also know that she's an

excellent candidate for treatment and therapy.  Those are

just a few of the sort of thumbnail grounds I laid out

for the Court.  This case, unlike many we see where the

defendant's charged with these identical circumstances.

This case is really a departure from the heartland of

cases I would say to Your Honor.  There are a number of

facts about this case that are really distinct and really

distinguish them from other persons similarly prosecuted.

Deborah Tipton is here -- appears before Your

Honor this morning and is 45 years old.  She was 43 at
the time of these offenses.  She was originally born in
New York state.  Her parents are here today in support of
her.  She married and moved to this state, moved to
Henderson County, back in the year 2000.  She was married
in Florida.  She was the mother of two children.  She
separated at or about the time of these offenses, and she
is now divorced.

        Your Honor knows from the various materials you've
read that she has no history of substance abuse of any
kind.  She has no history of pornography or engaging in
pornography or inappropriate contacts with minors or
anything of that character or anything of that nature.
There's simply no history of it here.  There's no prior
criminal record of any form.

        You know that my client, if Your Honor please, had
devoted her life to teaching.  She was an educator.
Unlike Mr. Hamby, she was not an administrator.  She
worked in various positions.  She was an assistant, and
at some point she was a substitute teacher.  She
eventually became a full-time teacher of children around
the eighth grade level.  Not just any children, either,
but handicapped children, Special Needs children.  She
was a Special Educations teacher and that's what she had
devoted her life and her craft to.

1        There are, sort of, three points I want to call to

2   the Court's attention that I think are significant for

3   Your Honor to consider in sentencing in this case.  One

4   is -- and I mentioned this briefly a moment minute ago.

5   If Your Honor please, the damage that has been done and

6   the injuries -- the harm that has been caused to the

7   victim in this case may not surface or appear for many

8   years to come and we understand that.  We accept that.

9   That being said, though, the damage that has been caused

10  by the forced separation, even the trauma of this

11  judicial process, which is unavoidable, cannot also be

12  denied in this case.

13       The separation of Ms. Tipton out of the family and

14  away from that family has had a profound effect on

15  persons involved in this case.  There was therapists

16  involved in this case early on, and you have a copy of

17  her report, it's Polly Penlan.  And it was Ms. Penlan who

18  opined that there is far more damage to the child by the

19  mother being taken away than any act charged here.

20  That's her opinion, and I understand that.  But if there

21  was one thing that was really telling about the harm in

22  this case it was the statement of the victim herself -- I

23  think it was actually attached to the objections to the

24  presentence report -- because the victim made a statement

25  when she was being interviewed by Dr. Husted, the MD who

did the psychological evaluation. He asked her very

candidly. He said, you know, if there's one thing -- if

there's anything you could change in your life about this

right now, what would it be? And the victim reported to

him, you know, I would just like to have my mom back.

The second point I want to call to the Court's

attention -- and I mention this also just as to the

disparity. The distinctions in this case are striking.

The evidence in this case, I would say to Your Honor,

contrary to what Mr. Hamby told this agent, was

Deborah's Tipton's design or Deborah Tipton's plan. My

client is not a pedophile. We can quibble over words,

but I think Dr. Husted, the MD who did the evaluation in

this case who -- the therapist by the name of Honeycutt,

you've read her report. There was also an examination

that was done by Dr. Middleton.

All of these persons have determined and all these

persons have stated, if Your Honor please, that while she

was engaged in this relationship and apparently trying to

fulfill this man's needs or this man's fantasies, these

were not fantasies that were Deborah Tipton's. These

weren't needs that she had to have met. And I would say

to Your Honor that that is one thing that distinguishes

Deborah Tipton's case from other persons similarly

charged. This is not a case where we have any kind of

intentional infliction of physical harm or at least, hey,
no minor -- this is not a situation where we have some
sort of networking or cache of pornographic images or sex
-- children in sexual activities out there.  This is not
a case where we have a network of sharing of materials
between persons or going online.  This is not a case, if
Your Honor please, of any sort of lewd or lascivious
touching or contacts involving minors.

As a matter of fact, if you compare Deborah Tipton
and what she did in this case to the acts of the
co-defendant who was just sentenced, that person did
indeed admit an addiction to watching children, as I
recall, girls between the ages of 13 to 15 over Limewire
for some period of time.  That does not diminish her
culpability and I understand that.  That does not
undercut her, you know, her own guilt here or that's not
a justification for what she did.

But it is important, I think, if Your Honor
please, to recognize that Mr. Hamby was the one who
provided the camera.  He told her how to operate the
camera.  He's the one, if Your Honor please, who
requested these videos from her, both her personally and
from one other source.  So the fact that he comes in here
and is facing a minimal sentence, at least compared to
what Deborah Tipton is facing, that disparity is striking

in this case.  Early on, she faced a multiplicity of
charges.  Her exposure, frankly, would have been much
greater than what she is facing before this court today.
Hamby has not had to face that, and that is disturbing to
me in this case.

Thirdly, if Your Honor please, but for these
charges, but for this case that is before you today,
Deborah Tipton has led -- without any sort of
explanation, she has led a very productive life.  She's
led a positive life, both in her professional community
and her life at home.  She's contributed significantly to
her profession and her teaching endeavors and the persons
that she's dealt with.  She has been a loving and
attentive mother to her family.

Your Honor knows from reading the psychological
reports that this woman had really had an extraordinarily
close relationship with her children.  That's not
something she fostered.  There was nothing devious about
that, in light of what's happened here.  That's the kind
of bond and that's the kind of relationship she had with
her own kids.  She has been a good person the entirety of
her 45 years, certainly a law-abiding citizen but for
this event that brings her before the court here today.
I just hope that, in consideration of what you think is a
fair and a just sentence, your judgment will in some way

serve to reflect that.

You know, this was a single incident. We claim, whether it qualifies as abhorrent behavior, it is an abhorrent act. If Your Honor please, that was a departure from a life of being a law-abiding citizen. That's really what it was to Deborah Tipton. The judgment, I hope it reflects in some ways her own struggles and her own shortcomings in this case. You know from the various opinions you've read of the therapists and doctors that examined her that this is a woman who had a lot of issues and continues to have a lot of issues, some which are mental health issues, dealing with her own depression and adjustment disorders, personality problems.

She was very vulnerable at the time she was in this relationship with Hamby, and I think all parties have concluded she was easily influenced. Again, that is not justification for what she's done, but I think that is some explanation for why a woman who was 43 at the time, who had led a law-abiding life, who was close and bonded and in a loving relationship with her family, was brought to the point that she did. So if Your Honor please, these are just some of the factors I would argue Ms. Tipton's path that I would argue to the Court extracts or removes this case from the heartland of

similar cases like this.

Your Honor is going to enter a sentence today.
I've appeared before Your Honor enough to know you're
very -- you're very thoughtful, not just about this case
but all cases, and you try to impose a sentence that you
think fashions such that the punishment will fit the
crime. That's really all I can ask on behalf of my
client today.

You have been inundated with the motions and the
paperwork filed by both sides in this lawsuit over the 17
months that this case has been in gestation. You have
probably seen and read and been confronted with more
things in duplicate than you ever needed to, and I
apologize for that. But I just ask Your Honor to be
compassionate and to consider her past, not just what
happened here, and do your best to make that judgment
that you impose today proportion to the crime that was
committed.

A couple of special requests, and they're only
borne out by what you've seen in some of the filings.
Ms. Tipton, evidently, has a series of mental health
issues that need to be addressed in the service of her
sentence. Any facilities or programs that are available
at the Bureau of Prisons, I would make that request on
her behalf. Also, like Mr. Hamby, the very nature of

this charge and her admitted involvement in this charge
is as a sexual offender.  So any participation she might
have in any sort of treatment program while she's
incarcerated would also be welcome.  Thank you.

THE COURT:  Thank you, Mr. Stewart.

Ms. Randall, what's the position of the
government?

MS. RANDALL:  Your Honor, the government is
recommending a sentence of 240 months in this case.
Before addressing the 3553A factors, I wanted to briefly
respond to the defendant's motion for a downward
departure.  As Your Honor's already noted, the abhorrent
behavior departure does not apply to this type of case.
Because of the nature of the conviction, it specifically
says the Court should not consider an abhorrent behavior
departure.  However, with regard to the assistance to
authorities, they claim that because of her interview
that she gave to law enforcement the one time she spoke
to law enforcement that that led to the investigation and
prosecution of Mr. Hamby, and that's just completely not
true.

Mr. Hamby pled to knowingly receiving child -- a
visual depiction of a child engaged in sexually explicit
conduct.  And if you look at Ms. Tipton's interview with
law enforcement, which is Government's Exhibit 2, what

she says about Mr. Hamby's involvement was that he never
asked for a picture of the victim. "I don't remember him
actually asking for them. I don't think he asked me."
How does that lead to the conviction of Mr. Hamby? She
did nothing to lead to his conviction. Law enforcement
already knew Mr. Hamby had the video before they
interviewed her, Your Honor, because of the fact that the
forensics and the information from FlipShare showed he
received the video. And when he was interviewed, he
immediately admitted to what he did. That's what led to
his conviction. It had absolutely nothing to do what
with what Ms. Tipton did in this case. If anything, she
minimized his and her behavior in this case.

     With regard to the 3553(a) factors. Your Honor,
the government is seeking a 240-month sentence in this
case, receiving 240 months on the transportation and 120
months on the possession charge to run concurrently,
because it was the same image that's the basis of both of
those offenses. However, that doesn't -- the fact that
the government's asking them to run concurrent does not
negate the nature and circumstances of this case.

     Your Honor's had a chance to review the video
that's at issue. This is not an anatomical video. It's
not an educational video. It is a video produced by a
woman hoping to sexually excite the man she had engaged

1  in a seven-year relationship with.  There are innocent

2  bathtub pictures of children that exist; this is not one

3  of them.  It's child pornography.  I know the defense

4  objects to me calling it "child pornography," but child

5  pornography is defined as a visual depiction of a minor

6  engaging in sexually explicit conduct, which is what she

7  pled guilty to Your Honor.

8          Why did she do this?  Why did she initiate this?

9  Why did she film this?  Why did she distribute it?

10  Because she wanted to please the man that she was

11  engaging in a sexual relationship with.  She got sexual

12  gratification out of that, Your Honor.  They say

13  Mr.  Hamby is the dominant one in this relationship, but

14  there's no doubt she was receiving satisfaction from this

15  as well Your Honor.  She was willfully engaging in all of

16  these behaviors over a seven-year period.  That's what

17  led to her betraying the trust of her child.

18          The government would argue that the evidence in

19  this case shows that this affair had been going on for

20  several years.  In May of 2011, Mr.  Hamby left the

21  school and transferred to another school.  At that point,

22  their relationship slowed down.  Mr.  Hamby has stated

23  that, and the evidence has shown, that that's -- that he

24  had moved schools and this was occurring.  The government

25  believes at that point that Tipton feared that their

relationship was coming to an end.  They were not
chatting as much.  They had not met for any of their
sexual encounters.  They were not working out together.
She even told her therapist, Your Honor, in her
government -- in her defense exhibits that Hamby was
attempting to disentangle himself from her.  That's taken
directly from their case.  The fact is, her home life was
falling apart.  She cannot have a good relationship with
her husband.  She was using the one man that she did have
in her life that she was turning to -- she described him
as a friend to her, someone she went to for advice and
that she looked up to.  She was losing him as well.

        So she used her daughter in a sick attempt to
bring him back.  She was the one who told him, you should
see how she's developing.  She was the one who put it out
there knowing that it was something that would sexually
excite him.  And he did ask her to send it to him.  She
hasn't said that.  He's the one who admitted to it, Your
Honor.  And we would tell you that his testimony -- his
statement to law enforcement is quite reliable because it
was a statement against his interest.  He owned up to
everything he did, Your Honor.  He owned up to more than
we even knew about in terms of his previous reviewing of
child pornography.  We knew some about it.  He talked
about it and he gave us more detail on that.  He

completely owned up to his half of it. As you know,
Ms. Tipton said he never asked for it but he said, no,
when she told me about it, I said yeah, I want to see
that. Send it to me. Your Honor, so that's why we think
his statement is reliable in this case.

In the filings of this case the defendant
repeatedly tries to portray this as being an innocent
video; that it's something between her and her daughter
and that her daughter was participating in and asked her
to do. Your Honor's reviewed the videos and the
transcripts and I think that is what paints a different
picture. In the one video she surprises her daughter in
the shower. It's clear because her daughter says, what
are you doing? Oh, my gosh, mom. And she has the camera
videotaping her daughter. She's telling her to "show
me." And then her daughter is showing her and singing
and dancing. At some point Tipton brings the camera to
show her daughter's genitalia. And the daughter says,
"What are you doing?" And she's the one who says, "Time
for an update." Her daughter says, "What are you doing?
Oh, okay." And she instructs her, "open it up," meaning
her vagina. "Let me see. Open. Open it up again." And
she continues. "Open it up more. Let me see what's
inside the folds. Spread it so you can see the hairs
inside, too."

1    Your Honor, as you've seen, the video is
2 horrifically and disturbingly centered on what is a lewd
3 and lascivious shot of the child victim in this case.  It
4 shows more than that.  She also shows other parts of her
5 daughter's body, never attempting to capture her face.
6 And what is particularly disturbing about that video is
7 the last thing Ms. Tipton says.  As she's closing out the
8 video she says, "Enjoy," which is the same word she put
9 on the e-mail she sent Mr.  Hamby when she sent this
10 video, she claims.  She closes that video out "Enjoy" and
11 that is what she put as the heading when she sent that
12 video to Mr. Hamby.

13    The same thing with the other video, Your Honor.
14 She tells her daughter that we're taking an educational
15 video to teach you how to shave your arms.  But instead
16 of showing her daughter shaving her arms or her armpits,
17 she's showing her genitalia.  Again, the camera is
18 focused solely on her genitals and doesn't have her face
19 or her arm in it.  It starts out showing her arms, but
20 later on it drops down below her waist.  And her daughter
21 says, "Will you stop staring there and look at my
22 underarms?"  And she was like, "Wow.  I'm getting up
23 close."  And her daughter is like, "No.  Up.  Up here.
24 Up here."  And then Ms. Tipton again goes down to show
25 her genitals and says, "I want to see this again. Pull it

1   out more."  And when the victim says, "It doesn't go much

2   farther than that," she says, "It doesn't?  Are you

3   sure?"  Ms. Tipton was clearly the one directing this and

4   instructing her daughter on what to do so that she could

5   create this video and Immediately send it to Mr.  Hamby

6   with the title "Enjoy."

7        What's particularly disturbing about this, Your

8   Honor, is what led up to it.  She told him, "I have a

9   surprise for you."  She tried to build up the

10  anticipation he was going to have of viewing a video of

11  her own daughter.  And when she sent it to him she told

12  him, "I wish I could be there to sit on your lap and feel

13  you get excited" by her daughter, Your Honor.

14       And in this case she had picked what could only be

15  described as the perfect victim, someone who trusted her,

16  looked up to her, believed she would protect her; someone

17  she believed would never hurt her, Your Honor, someone

18  who was close to her and that would never tell, someone

19  who would believe her when she said we're doing these

20  videos to document your maturing and how we're doing

21  these shaving lessons.  Her daughter believed this was

22  something between them, something that was part of their

23  bond, but it didn't stay that way.  She sent it to Mr.

24  Hamby, a man they claim is a pedophile; a man who they

25  claim is a horrible, horrible person.  She's the one who

sent him the video, not knowing if he was going to

distribute it to other people, not knowing what he was

going to be doing with it. She didn't care. She didn't

care about protecting her daughter all she cared about

was satisfying her and her lover's sexual needs, which

brings me to the characteristics.

Your Honor, she wants to say she's a good mother.

She's brought forward people and psychiatrists reports to

say she's a good mother. A good mother does not make

this individual. A good parent would not send this to a

man as a surprise and say she wanted to sit on his lap.

It's disturbing -- again, Your Honor, it's so disturbing

to think she wanted to feel the erection of someone who

is sexually viewing a video of her daughter.

I know Your Honor's found she's accepted

responsibility, but what acceptance she put forward is

bare minimum. To this day, in her reports, she's still

saying maybe my husband did this to frame me. Maybe I

did it by accident. I didn't make a sexually explicit

video. If she can't admit what she did is wrong, Your

Honor, what hope is there for rehabilitation in this case

or that she would not do it again in the future? Their

filings and their argument today, all it does is blame

everyone else. It doesn't talk about what she did and

the harm that she caused to her daughter. They blame it

1  -- the only acknowledgment of her role is to say that

2  she's socially immature and a people pleaser; that it's

3  Chad Hamby's fault because he asked her to do it.  That

4  makes no sense.

5       If Mr. Hamby had given her a suitcase of cocaine

6  and said take this to Mexico, she wouldn't have done

7  that.  If he had said I want a video of you raping your

8  child, are they going to say she would have done that

9  because he asked her to?  If he had said I want to -- I

10  want a video of you killing somebody, was she going to do

11  that?  No.  She knew right from wrong.  She could draw a

12  line, Your Honor, but this was not a line she wanted to

13  draw.  She wanted to give this to him because she wanted

14  to entice him, Your Honor, and she needs to take

15  responsibility for this.

16       She's also blaming her divorce.  This was a highly

17  contested divorce case, a separation, but that inures the

18  fact this video was taken months before the separation.

19  Yes, there was probably marital discord going on in the

20  house.  But there was no divorce filing yet, Your Honor.

21  That did not occur until months later.  This was a video

22  she created before that ever happened, and it did not

23  arise out of this highly contested civil litigation.

24       In her favor she does have a strong support

25  system, Your Honor.  I've had the opportunity to read the

letters and affidavits submitted by her friends and
family, and the one thing that jumped out to me is many
of them still don't think she did anything wrong.  They
say things like, if she did do this, you know, and this
is after she's pled guilty.  "If she did do it," or "I
still believe there's reasonable doubt."  It says two
things:  She hasn't admitted to them what she actually
did, and they don't really know who she is and what she's
capable of.

It reminds me of her detention hearing when people
stood on her behalf and offered her a place to stay.
The magistrate said he wished he had friends like that.
But what he said was they don't know what he knows.  They
don't know what's in the complaint.  That's the case
here.  They don't know what we know, Your Honor.  They
haven't had access to this discovery to know what this
actually entails.  We're not saying she's a pedophile,
Your Honor.  What we're saying is she knew what she was
doing and she did this on purpose.

With regard to the sentencing disparity argument
and what they refer to as the "equal protection argument"
claiming because she's a woman, she's being treated
differently.  It's ironic, Your Honor, because she's
asking this court to treat her differently because she's
a woman, because she's a mother.  She relies heavily on

the status of the fact she's a mother in asking for this
downward variance.  I can't imagine a case where a man
would ever come before this court, or has ever come
before a court, and said I'm the father of the victim and
I need to be there for the victim.  You should let me be
there because you're harming the victim by not having
their father.  In fact, normally, we vilify a mother who
stays with a father who has produced images of a daughter
or a son.

        And then with Mr.  Hamby.  They're trying to say
he's the one -- he should face more equal criminal
charges.  Your Honor, they want him to plead to accessory
or aiding and abetting the production of child
pornography, which is ironic because they argued there
was no child pornography throughout this whole thing and
that it wasn't sexually explicit until today.  Why should
they have Mr.  Hamby plead to production when she didn't
plead to production?

        They actually pled to what they did in this case.
He pled to receiving the video she transported.  She pled
to transportation and possession.  There is no unequal
application of the prosecution's discretion in this case,
Your Honor.  They pled to what is sentenced under the
exact same guideline, 2G2.2.  Hers is higher because she
is more culpable.  What she did is more egregious and

more abusive.  Your Honor, she is one who took the video.
She's the one who abused her own daughter and she's the
one that distributed it.  But for her actions, Hamby
would never have received that video and her husband
never would have found it, Your Honor.  So her guidelines
cross-referenced 2G2.1.  He stayed under 2G2.2 because he
was not involved in the production aspect of the case.
So there is no sentencing disparity in the case.  The
guidelines are what led to the sentences being what they
are.

Although not discussed much today, the filings,
Your Honor, repeatedly attack her husband and try to
shift a lot of the blame to him and he saying should be
facing as much time as her.  Your Honor, people like
Mr.  Tipton are not exposed to this like you or me or the
defense counsel are.  We are someone who sees and who
deals with child pornography type cases all the time.
When you take the average person off the street who
doesn't even think child pornography really exists, they
don't even think about it, and you throw them in the
middle of this, a typical reaction is to be shocked and
is to be confused by it.

Would I have loved for him to run to law
enforcement immediately?  Yes, that would have been the
best reaction, Your Honor, in an ideal world.  But when

you're in the middle of a messy divorce, and when
everything you do is going to be watched and critiqued
and you're going to be accused of doing things, the fact
that it took an extra minute to take it to someone he
trusted, like a therapist or his attorney, and to be
like, is this what I think it is, Your Honor, before
calling law enforcement is not -- shouldn't be held
against him or give her any kind of grounds for a
variance.  Because as soon as he talked to someone he
trusted, he was there -- he talked to police; he talked
to DSS, Your Honor.

And with regard to other child pornography cases.
Your Honor, I'm not sure exactly what sentence they're
asking for.  They're just seeking a variance.  But if you
look at other child pornography cases in this case where
someone produced a video or an image, as reflected in the
sentencing memorandum the lowest sentence I found was 168
months and they go all the way up to 37 years.

I know Your Honor has sentenced multiple people
who produced child pornography, some in very similar
cases to Ms. Tipton, some worse and some not as bad.
Mr.  Tillman, I know, got 37 years.  Mr.  Barrel, I
believe, got 28 years, Your Honor.  So the sentence we
are seeking is within the heartland of what she did.  The
fact that she doesn't have a criminal history, Your

Honor, is actually already taken into account which the
guidelines.  If she had a criminal history, if she had
been caught doing something like this before, she would
be facing a much, much higher sentence.  We think the
sentence of 240 months would address the seriousness of
the offense, Your Honor, and be the just punishment in
this case.

I know Your Honor recognizes the harm -- the
perpetual lifelong harm this is going to have to not only
the victim but her family.  There is no doubt there was a
strong bond between her and her mother, and for her to
lose her mother has been completely painful to her.  And
her having to work through that, Your Honor, is horrible.
And that's on top of knowing what she knows about her
mother sending this video to Mr. Hamby.  That's all
Mrs. Tipton's fault.  She's causing all of that harm to
her daughter and has turned her life upside down.

At the closing of the argument, Your Honor, I will
hand up Mr. Tipton's Victim Impact Statement which is
marked as Government's Exhibit 4.  He had planned on
reading it, Your Honor, but we're going to instead file
it to try and maintain some of the privacy of the victim.

THE COURT:  That's the same Impact that was filed?

MS. RANDALL:  It's not, Your Honor.  It's about a
little over a page, if you take out the part he scratched

out.  It's kind of an update of what's happened since
then.

And with regard to the ongoing harm, Your Honor,
of her being separated from her daughter.  This is
something the government spoke at length with the
guardian ad litem about, who has been in very close
contact with the therapist in this case.  We recognize
the fact that her daughter is suffering from the lack of
a relationship with her mother, and we are actually going
to ask the Court to enter into the judgment a way for the
daughter to have very limited contact with her mother, as
seen fit when the victim wants it, but also as seen fit
by her therapist and the guardian ad litem, Your Honor.

We would like an opportunity for her to talk to
her mother and ask her the questions she wants to ask and
hear what her mother has to say, but we want it to be a
supervised contact visit, preferably supervised by her
therapist or the guardian ad litem.  I know I've talked
to the guardian ad litem who is willing to do it, and I
believe the therapist would be as well.  She is here, as
well, because we are trying to ameliorate some of the
harm that's been done to her, harm that's been caused by
Mrs.  Tipton.  So that should remedy any concern that she
needs to get out sooner because it's harming her daughter
not to have any contact with her.

1    Your Honor, I don't want to repeat too much in

2  this sentencing memorandum but I can't talk enough about

3  the reason she's deserving of this sentence is because,

4  while there may not have been a hands-on sexual offense

5  in this case, the fact that she abused the relationship

6  she had with the victim in this case and that she was so

7  willing to do that for such a stupid reason, Your Honor,

8  speaks that there needs to be a strong message for

9  deterrence, not only for her but other people like her,

10 Your Honor, who are willing to use their children as

11 pawns in their sexual relationship; willing to use their

12 children as bait in order to make a man happy.

13    She is a smart woman.  Your Honor, she has a

14 master's degree.  She knows right from wrong and she

15 could have said no, but she wanted to be in this

16 relationship.  This was a seven-year relationship.  This

17 wasn't something that was new to her.  This wasn't

18 something where she was trying to figure it out.  She was

19 comfortable in this relationship.  She depended on this

20 relationship.  She wanted it to continue.  And because of

21 that we are here today.  She needs to own up to that and

22 she needs to receive a just punishment that will reflect

23 that.  Therefore, we are seeking the sentence of 240

24 months in the case.

25    We would ask that you incorporate the judgment of

forfeiture, Your Honor, into her final judgment.  We did
file the restitution memorandum similar to what we did in
Mr.  Hamby's case.  If I could just hand up Government's
Exhibit 4 at this time?

THE COURT:  You may approach and hand that up.

Ms. Tipton, at this time you have the opportunity
to address the Court and to tell me anything that you
feel I need to know before I make my decision about your
sentence in this matter.

THE DEFENDANT:  Your Honor, I just wanted you to
know that I love my family and my children very, very
much and I am very sorry for all my bad judgments and
mistakes that I have made.  And I never wanted to harm
them or anybody.  And I have -- I've caused a lot of pain
and a lot of suffering for not just my children, my whole
family, for everything that they've had to go through.

My parents have, you know, put up their retirement
to help cover my fees.  And they haven't seen their only
granddaughters -- very limited.  They've been being kept
from them and I know that hurts them very much.  I hope
some day that I can repay them for everything that
they've done for me.  And I have -- I've lost everything,
everything.  I mean, my career, everything that I owned
that's still in the house.

More than anything, I've lost my children.  And

that's -- that's very difficult.  I know it's difficult

for me.  I can only imagine what they're going through

with all of this.  We were -- we were very close.  We did

everything together.  I taught -- I mean, I taught at

their school.  We were together from the time I woke up

in the morning until the time, you know, I read them

bedtime stories at night.  I was involved with all their

activities and events.  And, I mean, they would come to

me with everything.  I mean, T.L. has lots of questions

and always did, and we'd answer them and try to find the

answers to them.  And she'd come to me with all of her

problems, you know, when she was upset or angry, and, you

know, we'd always talk it all out.  She would come to me

with the bright ideas that she always had and, you know,

things that she wanted to try.  And it was -- we were

very close.

I've taken that.  And it's all -- it's all gone,

and I can't get that back.  I can't do it over.  I mean,

I made mistakes, bad judgments, and there is no do-overs.

I can't take any of that back.  I can just learn from my

mistakes and move on.  I mean, I pretty much abandoned my

kids.  I mean, one day T.L., you know, may recollect my

promise not to leave her alone and then the next I get a

phone call and walk out that door.  I didn't even get to

say good-bye to them.  I just walked out that door and

1   haven't seen them in 19 months.  That was February 21st

2   2012.  At 7 o'clock that night I just walked out the

3   door.  And I can't even imagine what they're going

4   through because of what, you know, I'm going through here

5   not being with them and wondering what they're doing and

6   how they're doing.

7        I can only imagine what they're doing and having

8   to go through and how they're coping and what they're

9   facing on the outside with all the people and the media

10  and everything.  I just -- I don't know.  I pretty much

11  just walked out of their lives.  I just hope that they

12  can forgive me for what I've done.  And I just -- and I

13  pray to God every night that T.L. doesn't blame herself

14  for any of this.  She doesn't have anything to do with

15  this.

16       It was all my fault and I've learned a lot from

17  this experience.  I mean when you go through something

18  like this, you can't take back the past.  Like I said,

19  you can't do it over.  You can only learn from it and

20  just move on and move forward and just try to make you a

21  better person from it; maybe help others not to make the

22  same mistakes that I've made and keep them going from

23  going through the same trials that I've been going

24  through.

25       I just -- I'm sorry.  I just want to be able to

1   make opportunities out of this, too.  I mean, I've lost

2   my career.  I just want an opportunity to go on and do

3   something else with my life, you know, follow other

4   passions that I have and be able to reunite with my

5   children again and get back to being the mother that I

6   was and being in their lives again.  I just miss them

7   very much.  I'm sorry for everything that I've done and

8   everything I've put people through.  I mean T.L. and my

9   family, everybody.  I can't take it back, but I can just

10  try to make the best of it from here on out and make

11  myself a better person and try to help others.  Thank

12  you.

13          THE COURT:  Thank you, Ms. Tipton.

14          Pursuant to the Sentencing Reform Act of 1984 and

15  the case of *United States versus Booker*, it is the

16  judgment of this court, having considered the factors

17  noted in 18 U.S.C., Section 3553(a), that the defendant,

18  Deborah Lee Tipton, is hereby committed to the custody of

19  the United States Bureau of Prisons to be imprisoned as

20  to Count Two for a term of 216 months and as to Count

21  Three for a term of 120 months, with those terms to run

22  concurrently.

23          With regard to the application of the factors for

24  sentencing under the statute.  There are several factors

25  that go into this decision regarding the sentence.

1 First, as I say often in these child pornography cases, I

2 find that the sentencing guidelines are of very limited

3 value in assessing what an appropriate sentence is,

4 because I think there is a certain disconnect between the

5 statutory sentencing scheme set out by Congress and the

6 guidelines scheme set out by the Sentencing Commission.

7 With these cases I see the statutory scheme

8 largely broken down into three categories or three

9 brackets: The possession offenses which are bracketed

10 for sentences of zero to ten years, the transmission

11 offenses that are bracketed for sentences of five to 20

12 years, and the production offenses which are bracketed

13 for sentences of 15 to 30 years. I think it is clear

14 that this falls in that third category, that being a

15 production offense.

16 The argument has been made here that there is a

17 disparity between the sentence being sought by the

18 government and what has been provided by the Court here

19 in this case versus what Mr. Hamby received. However, I

20 believe that the facts here are that this is a production

21 offense. Whereas, I don't believe that the evidence

22 supported a production offense in Mr. Hamby's case. Not

23 to excuse his conduct -- he got a lengthy sentence, too

24 -- but his was not a production offense and this one is.

25 Viewing this case, then, within that 15- to

30-year bracket which, I believe, is the only appropriate
bracket within which to view this case, there are certain
things that mitigate and certain things that are
aggravating.  All of these reflect the seriousness of the
offense, which is one of the primary factors for
sentencing under the statute.  Of course, mitigating
aspects here are the fact that the victim here was not
forced or induced to commit any sort of sexual act which
is often seen in these child pornography cases and,
therefore, that moves it toward the lower end of the
bracket that is at hand.

Also, there was no sexual contact between the
defendant and the victim.  However, there are aggravating
factors here.  First and foremost, there is the breach of
probably, the most sacred position of trust and
confidence that one person can have in another in this
case.  As I am in this job, after a while, you think
you've seen everything.  I have to say that this is a new
one for me.  I did not think I would ever see a case like
this.  The breach of that position of trust that has been
exhibited in this case is clearly a factor that does not
allow me to impose a sentence at the low end of the
bracket of 15 to 30.  In addition, this case is very
similar to one that we've had here in this court not too
long ago that was also not a contact offense, also

involving minors of approximately this same age, but that
one involved voyeurism, really. Whereas, this one
involved the manipulation of a child and I see that as
being something of an aggravating factor as well.
Another factor I have here is the fact that even though
the defendant admits the facts of her offense, she does
not seem to have come to grips with the criminality of
her actions, and that is an aggravating factor as well.

Taking all of those things into account, I
believe, reflects the seriousness of the offense. I
believe that that is also a -- it provides a sentence
that is necessary to afford adequate deterrence to
criminal conduct and provides just punishment for the
offense in this matter. I believe that this sentence
also avoids unwarranted sentencing disparities among
defendants, not just as between this defendant and
Mr. Hamby but as between this defendant and others who
produce videos depicting minors engaged in sexually
explicit activity. For those reasons I have imposed the
sentence that I have.

The Court calls to the attention of the custodial
authorities that the defendant has a history of mental
health issues and recommends that the defendant be
allowed to participate in any available mental health
treatment programs while incarcerated as may be

recommended by a mental health professional.

The Court recommends that the defendant be participate in a sex offender treatment program while incarcerated, if eligible.

It is ordered that the defendant be required to support all dependents from prison earnings while incarcerated, as outlined in the presentence report.

Upon release from imprisonment the defendant shall be placed on supervised release for a term of the balance of her life. That is a life term of supervised release as to Count Two and a life term on supervised release as to Count Three, with those terms to run concurrently.

Within 72 hours of release from the custody of the Bureau of Prisons the defendant shall report in person to the probation office in the district to which the defendant is released. While on supervised release the defendant shall not commit another federal, state or local crime and shall comply with the standard conditions that have been adopted by the court in the Western District of North Carolina.

In addition, the defendant shall have -- shall comply with the following additional conditions. The defendant shall have no direct or indirect contact at any time for any reason with the victims or affected parties in this matter unless provided with specific written

authorization to do so in advance by the United States
Probation Officer.

        The defendant shall submit to a mental health
evaluation and treatment program under the guidance and
supervision of the United States Probation Officer.

        The defendant shall remain in treatment and
maintain any prescribed medications until satisfactorily
discharged by the program and with the approval of the
United States Probation Officer.

        The defendant shall submit to a psycho-sexual
evaluation by a qualified mental health professional
experienced in evaluating and managing sexual offenders
as approved by the United States Probation Officer.

        The defendant shall complete the treatment
recommendations and abide by all of the rules,
requirements and conditions of the program until
discharged.

        The defendant shall take all medications as
prescribed.

        The defendant shall submit to risk assessments,
psychological and physiological testing, which may
include but is not limited to polygraph examinations
and/or computer voice stress analyzer or other specific
tests to monitor the defendant's compliance with
supervised release and treatment conditions all at the

1    direction of the United States Probation Officer.

2         The defendant's residence and employment shall be

3    approved by the United States Probation Officer.  Any

4    proposed change in residence or employment must be

5    provided to the United States Probation Officer at least

6    ten days prior to the change and pre-approved before the

7    change may take place.

8         The defendant shall not possess any materials

9    depicting and/or describing child pornography and/or

10   simulated child pornography as those terms are defined in

11   Section -- nor shall the defendant enter any such

12   locations where such materials may be accessed, obtained

13   or viewed, including pictures, photographs, books,

14   writings, drawings, books, videos or video games.

15        The defendant shall register as a sex offender and

16   keep such registration current in any jurisdiction where

17   she resides, where she is an employee, or where she is a

18   student.  For initial registration purposes only the

19   defendant shall register in the jurisdiction of

20   conviction if such is different from the jurisdiction of

21   residence.

22        The defendant shall not use, purchase, possess

23   procure or otherwise obtain any computer or electronic

24   device that can be linked to any computer network,

25   bulletin board, Internet, Internet Service Provider or

exchange formats involving computers unless approved by

the United States Probation Officer.  Such computers,

computer hardware or software, is subject to warrantless

searches and/or seizures by the United States Probation

Office.

The defendant shall allow the United States

Probation Officer or other designee to install software

designed to monitor computer activities on any computer

the defendant is authorized to use.  This may include but

is not limited to software that may record any and all

activities on computers that the defendant may use,

including the capture of key strokes, application

information, Internet use history, e-mail correspondence,

and chat conversations.  The defendant shall pay any

costs related to the monitoring of such computer usage.

The defendant shall not use or have installed any

programs specifically or solely designed to encrypt any

data, files, folders or volumes of any media.

The defendant shall, upon request, immediately

provide the probation officer with any and all passwords

required to access any data encrypted or compressed for

storage by any software.  The defendant shall provide

complete records of all passwords, Internet Service

Providers, e-mail addresses, e-mail accounts, screen

names and the like, both past and present, to the

probation officer, and shall not make any changes without the prior approval of the United States Probation Officer.

The defendant shall not use possess or control any bootable Linux or counter-forensic tools.

The defendant shall not have any social networking accounts without the approval of the United States probation officer.

During the period of supervised release the defendant shall notify all employers, family, friends, and others with whom she has regular contact of her conviction and/or history as a sex offender and that the defendant is being supervised by the United States Probation Office.

The defendant shall not be employed in any position or participate as a volunteer in any activity that involves direct or indirect contact with any children under the age of 18 without the written permission of the United States Probation Officer. Under no circumstances may the defendant be engaged in the position that involves being in a position of trust or authority over any person under the age of 18.

The Court will hold open the issue of restitution for 90 days pursuant to 18 U.S.C., Section 3663A and will allow for the submission of further filings with regard

to the issue of restitution.

It is further ordered that the defendant shall pay the United States a Special Assessment in the amount of $200.

The court finds that the defendant does not are the ability to pay a fine or interest. And having considered the factors noted in 18 U.S.C., Section 3572(a), the Court will waive the payment of a fine and interest in this case. Payment of the criminal monetary penalty shall be due and payable immediately. The defendant shall forfeit her interest in those properties as set out in the consent order and judgment of forfeiture entered by the Court in this matter as document 51 in the docket of this case which was entered by the Court on September 19, 2012.

The Court has considered the financial and other information contained in the presentence report and finds that the following is feasible. If the defendant is unable to pay any monetary penalty immediately, during the period of imprisonment payments shall be made through the Federal Bureau of Prisons Inmate Financial Responsibility program. Upon release from imprisonment any remaining balance shall be paid in monthly installments of no less than $50 to commence within 60 days after release until paid in full.

1      Throughout the period of supervision, the

2 probation officer shall monitor the defendant's economic

3 circumstances and shall report to the Court with

4 recommendations, as warranted, any material changes that

5 affect the defendant's ability to pay any court-ordered

6 penalties.

7      Mr. Stewart, are there any other issues regarding

8 either the sentence or the judgment that need to be

9 addressed?

10     MR. STEWART:  You might have mentioned it but did

11 you make a recommendation -- I request the Court make a

12 recommendation that whatever sort of sex offender therapy

13 was available and she participate in it.

14     THE COURT:  I believe I included that.  But just

15 in case I somehow skipped over that, I'll read that

16 portion again.  The Court recommends that this defendant

17 participate in a sex offender treatment program during

18 the period of incarceration if eligible.

19     MR. STEWART:  That's fine.

20     THE COURT:  I believe that was probably included

21 before but, just in case it was not, I include that now.

22     MR. STEWART:  That would be our only request, Your

23 Honor.

24     MS. RANDALL:  Your Honor, with regard to the

25 contact with the victim.  My understanding is the

1 standard condition and that they have to contact

2 probation applies on supervised release. For the time

3 she's incarcerated, if we could add a condition that she

4 is to have no contact with the victim except as initiated

5 by the victim and supervised by a third party, or

6 something along those lines. That would allow there

7 still to be supervised contact while she is in custody

8 until the standard condition comes into effect when she's

9 on supervised release.

10 Normally, in these cases when I want no contact I

11 ask the judge to -- I haven't done this in front of you

12 yet -- order a no contact -- a provision as part of the

13 judgment and then a contempt of court order charges.

14 Because my understanding is during that time she's

15 incarcerated there is really nothing preventing her from

16 contacting the victim, because her "no contact" hasn't

17 come into effect yet. So if we could do so some sort of

18 condition of her judgment that she is to have no contact,

19 except initiated by the victim and supervised by,

20 ideally, a guardian ad litem or her therapist to be there

21 with her for it.

22 THE COURT: Well, in terms of how that will be

23 supervised, is that even within my purview? Or, is that

24 within the purview of the Bureau of Prisons?

25 MS. RANDALL: Your Honor, that's a good question.

1  Maybe I can tell you kind of what our goal is, to help

2  you phrase it.  We know at some point Ms. Tipton is going

3  to be sent somewhere in the Bureau of Prisons.  We don't

4  know where she's going to be designated yet.  After

5  talking to the guardian ad litem -- I believe her father

6  is in agreement with us doing this.  The guardian ad

7  litem and the therapist thought it would be helpful for

8  her mental health for her to see her mother before she

9  gets sent off.  So they were going to try to arrange to

10 do it before she leaves the Madison County Jail.

11        THE COURT:  Mr.  Stewart, do you want to say

12 something in response?

13        MR. STEWART:  Your Honor, please.  There's been

14 some communication between the guardian's office and

15 Mr.  Jackson and I've not been a party to that.  I

16 understand the course of those communications has sort of

17 evolved to the point where they want the victim or

18 victims to have some opportunity to meet with the

19 defendant.  That's something we're wholly in favor of

20 under whatever terms, restrictions, conditions,

21 supervision, whatever may be required by the Court or the

22 probation office, or even the guardian herself.  That's

23 fine with us.  We'll certainly go forward with that.  We

24 think that would be therapeutic.  In this case we think

25 that might be helpful, certainly, for all parties.

1    THE COURT:  I will recommend that during the
2  period of incarceration -- recommend to the Bureau of
3  Prisons that during the period of incarceration that the
4  defendant will have no contact with the victim or any of
5  the victim's family members except as initiated by the
6  victim and/or the victim's guardian ad litem or the
7  victim's therapist, and that any contact be supervised by
8  either the guardian ad litem or Bureau of Prisons
9  personnel.  Anything else, Ms. Randall?
10    MS. RANDALL:  No, Your Honor, although I do
11  believe we still needed to approach the bench to put on
12  the record about what Mr.  Stewart's objections.
13    THE COURT:  Well, we'll just reserve that and
14  we'll put that on the record after we adjourn.
15    MS. RANDALL:  Okay.
16    THE COURT:  I know that there are some objections
17  that Mr.  Stewart has raised and that he wants to
18  preserve for the purposes of the record, and we'll allow
19  that.  Anything else?
20    MS. RANDALL:  No, Your Honor.
21    MR. STEWART:  No, sir, Your Honor.
22    THE COURT:  Ms. Randall is there a count that
23  needs to be dismissed?
24    MS. RANDALL:  Yes, Your Honor.  At this time we
25  would move to dismiss Count One of the indictment.

1      THE COURT:  That will be allowed.  Count One of

2  the indictment as to Ms. Tipton is hereby dismissed.

3      Ms. Tipton, you have the right to appeal this

4  sentence to the Fourth Circuit Court of Appeals on any

5  grounds that you've not previously waived.  You've

6  pleaded "guilty" pursuant to a plea agreement.  That plea

7  agreement includes some waivers that may substantially

8  affect your appeal rights.  You will need to consult with

9  your attorney as to what effect those waivers may have.

10      However, if you choose to appeal, you must file a

11  written notice of appeal with the clerk of this court

12  within a period of 14 calendar days following the date of

13  the entry of the final judgment in this case.  If you

14  wish to appeal but do not have the funds with which to

15  appeal, you may file an affidavit of indigency and, if

16  approved by the court, you may appeal at government

17  expense.  Do you understand this right of appeal as I

18  have explained it to you?

19      THE DEFENDANT:  Yes.

20      THE COURT:  Well, that will conclude this matter.

21  The defendant is remanded to the custody of the marshal.

22      I will say again that this is one of the most

23  unusual cases I've seen.  I didn't think that I would

24  ever see a case like this but, Ms. Tipton, it is from

25  here that you need to pick up the pieces.  I don't know

1   how you do that.  I think that you've done some things

2   that have torn your life apart, as well as others, but

3   from here it is -- you're going to have to do what you

4   can to pick up the pieces.

5         That concludes this matter.  The defendant is

6   remanded to the marshal.

7                     (Off the record at 12:14 p.m.)

8                   (Defendant excused from the courtroom.)

9                     (On the record at 12:17 p.m.)

10                  (Whereupon, Counsel vouched the record.)

11        MR. STEWART:  In the judges chambers he was -- in

12  the judge's chambers, in anticipation of the hearing, the

13  Court was given an opportunity to look at some of the

14  sentencing exhibits offered by the government in this

15  case.  In particular, there was a DVD disk, and I think

16  that was marked as Government's Exhibit 1.  And he was

17  asked to preview that or look at that in chambers.  The

18  defense objected to that.

19        There was also a transcription of that tape, and I

20  think it was labeled as Government's Exhibits 1, 1A and

21  B.  I objected to the admission of those exhibits as

22  well.  I didn't think they were pertinent, and I thought

23  they were too late in their disclosure and I didn't think

24  they needed to be examined by the presiding judge at a

25  time of the hearing.

1    The judge reviewed it, overruled it, and they were

2 used in the sentencing procedure.  So that was the basis

3 of it.

4                    (Off the record at 12:18 p.m.)

5

6                        **CERTIFICATE**

7    I, Tracy Rae Dunlap, RMR, CRR, an Official Court
Reporter for the United States District Court for the
8 Western District of North Carolina, do hereby certify
that I transcribed, by machine shorthand, the proceedings
9 had in the case of UNITED STATES OF AMERICA versus
DEBORAH LEE TIPTON, Criminal Action Number 1:12-CR-25 on
10 September 18, 2013.

11    In witness whereof, I have hereto subscribed my
name, this 2nd of December 2013.

12

13              __/S/__Tracy Rae Dunlap___
                TRACY RAE DUNLAP, RMR, CRR
14              OFFICIAL COURT REPORTER

15

16

17

18

19

20

21

22

23

24

25